LUMBERPORT-SHINNSTON GAS CO.

*v.*

PUBLIC SERVICE COMMISSION OF W. VA.

(No. 14873)

HOPE NATURAL GAS CO.

*v.*

PUBLIC SERVICE COMMISSION OF W. VA.

(No. 14874)

Decided October 28, 1980.

*Solomon & Solomon and David L. Solomon* for petitioner Lumberport-Shinnston Gas Co.

*Willis O. Shay, and Ralph J. Bean, Jr.,* for petitioner Hope Natural Gas Co.

*J. Gordon Pennington*, Legal Division, Public Service Commission of W. Va., for respondent.

NEELY, CHIEF JUSTICE:

These two consolidated cases present two issues of law: first, whether the Public Service Commission (PSC) is empowered to prohibit Hope Natural Gas Company (Hope) from terminating natural gas sales to Lumberport-Shinnston Gas Company (Lumberport); and, second, whether the PSC is empowered to limit the bonuses and salaries of Lumberport until the debt owed to Hope Gas has been paid. We hold that the PSC may prohibit Hope from terminating gas supplies to Lumberport and that the PSC may institute certain rules to insure the repayment of the debt to Hope. In that regard we remand *Hope Natural Gas Company v. Public Service Commission* to allow a method to be established that insures that Hope's debt will be repaid.

On 18 September 1979 Hope advised Lumberport by letter that since Lumberport had not made any payments since July on its past due account for gas service which totaled $431,056.62 service would be terminated 2 October 1979. In response Lumberport filed a petition with the PSC seeking to prohibit Hope from terminating its gas service, and the PSC prohibited the termination pending a final hearing. Two hearings were held during which Lumberport's financial condition and management were examined through testimony and exhibits. Lumberport has been in business since 1924 and serves approximately 3000 residential customers in the area.

While Lumberport has operated at a loss for several years, new management recently assumed control. Mrs. Lorna Hill purchased sufficient stock to become majority stockholder, made herself chief executive officer, and under her management reduced losses of approximately $250,000 in 1976-77 to $44,621 in 1978. It appears that the company may break even in 1979. Until 1979, Lumberport stayed current on its account with Hope by remitting to Hope the equivalent of the money it had been

paid by its customers for the gas purchased from Hope. Shortly after new management took over at Lumberport the payments to Hope ceased, although Lumberport continued to collect from their customers for the gas purchased from Hope. At the same time, administrative and general salaries increased from $41,136 in 1977 and $66,151 in 1978 to a current rate of $124,252 per year. A study of other gas companies in the state reveals the cost of administrative and general salaries to be within a range of about $.05 to $.10 per Mcf while Lumberport's current administrative and general salaries are about $.21 per Mcf.

The PSC entered a final order on 23 January 1980 which ordered Hope not to terminate service to Lumberport until further order of the Commission. Also, Lumberport was ordered to reduce its operating expenses by approximately $60,000, to pay no dividends, to pay no bonuses to employees in excess of $100 per year, and to pay its chief executive officer and controlling stockholder, Mrs. Lorna Hill, no more than $20,000 per year. All of these measures are to remain in effect until Lumberport has reduced its delinquent account to zero.

In a related rate making case for Lumberport, the PSC entered an order on 4 August 1980, affirming the hearing examiner's recommended decision of 11 March 1980 that required a capital contribution from customers in the amount of $.12 per Mcf to help retire the debt to Hope. According to the PSC that additional surcharge, along with refunds due Lumberport from Hope, should be sufficient to discharge the debt in less than seven years. Under that order the PSC required quarterly statements from Lumberport reporting the amount owed to Hope as well as other financial data regarding the financial status of Lumberport. In addition, the PSC's order required that at the time of original entry on Lumberport's books, all customer capital contributions were to be recorded *separately* from other revenues in an account entitled "Customer Contributed Capital." No orders were made to insure that the capital in that account be paid to Hope.

## I

In reviewing orders of the PSC our Court is guided by three central principles: first, that the primary purpose of the PSC is to "serve the interests of the public," *Boggs v. Public Service Commission*, 154 W.Va. 146, 154, 174 S.E.2d 331, 336 (1970); second, "[t]hat an order of the Public Service Commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles," *United Fuel Gas Company v. Public Service Commission*, 143 W.Va. 33, 38, 99 S.E.2d 1, 8 (1957); and, third, that the Legislature has empowered the PSC to regulate and control the public utilities in this State in a manner that is just and reasonable and not contrary to the law, *Delardas v. Morgantown Water Company*, 148 W.Va. 776, 137 S.E.2d 426 (1964).

In prohibiting Hope from terminating deliveries to Lumberport for failure to pay its delinquent accounts, the PSC acted in the overall public interest of the approximately 3000 residential customers who depend upon Lumberport for their gas supply, and who depend indirectly upon Hope, the supplier of over 50% of Lumberport's gas supplies. In support of its action in this case, the Commission relied upon *The Chesapeake Telephone Co. v. City of Morgantown*, 144 W. Va, 149, 107 S.E.2d 489 (1959) in which the PSC refused to allow the City of Morgantown to compel the removal of C&P's telephone facilities until the city had received approval from the PSC.[1] Hope argues that they have a common law right to terminate service upon proper notice, *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); however, the United States Supreme Court was considering the termination of facilities to individual customers in that case and not

---

[1] This is supported by the PSC's finding that the termination provisions of Rule 4.06 of the PSC's *Rules and Regulations for the Government of Gas Utilities and Gas Pipeline Safety* do not apply to customers of utilities who are utilities themselves.

termination of service to another regulated utility. The duty of the utility to render adequate service to the public must extend to the company that supplies the gas to the distributing company, since "[t]he jurisdiction of the commission shall extend to all public utilities in this State, and shall include any utility engaged in any of the following public services . . . whether directly or through a distributing utility; . . ." *W.Va. Code*, 24-2-1 [1979].[2]

The Commission has not, however, developed a reasonable procedure for insuring that Lumberport will repay its debt to Hope within its anticipated seven year time period. While the Commission approved a $.12 per Mcf customer contribution surcharge to be used to retire the outstanding debt to Hope, there was no provision made to insure that the additional funds collected would actually be paid to Hope. Therefore, we direct that a special escrow fund, which will contain such surcharge funds, be established to insure the payment to Hope.

## II

In considering the action taken by the PSC we must consider the extent of the powers that were conferred upon the PSC by the Legislature only one year ago in *W. Va. Code*, 24-2-7(b) [1979].[3] That statute authorizes the

---

[2] Our Court has previously held that the fact that the utility does not distribute the gas directly to the public is irrelevant. In *Preston County Light and Power Company v. Renick*, 145 W. Va. 115, 113 S.E.2d 378 (1960), the Court found that an electric company that sold electricity only to the applicant was subject to the PSC's jurisdiction. Our Court also noted in *Renick* that all contracts made by a utility relating to public service must be deemed to have been entered into in contemplation of the exercise by the State of its regulatory powers whenever the public interest required it. *See, Benwood-McMechen Water Co. v. City of Wheeling*, 121 W .Va. 373, 4 S.E.2d 300 (1939).

[3] *W.Va. Code*, 24-2-7(b) [1979] reads:

(b) If the public service commission shall determine that any utility is unable or unwilling to adequately serve its customers or has been actually or effectively abandoned by its owners, or that its management is grossly and willfully inefficient, irresponsible or unresponsive to the needs of its customers, the commission may petition to the circuit court of any county

PSC to request an order from the circuit court that allows the assets of a utility to be attached and the utility placed into receivership; however, that is the most drastic remedy, and before petitioning the circuit court for receivership the PSC should determine that: (1) the utility is unable or unwilling adequately to serve its customers; (2) the utility has been grossly and willfully inefficient; or (3) the utility has been irresponsible or unresponsive to the needs of the customers. Thus the PSC must find gross or willfully inefficient management before beginning receivership proceedings. Under *W.Va. Code* 24-2-7(a) [1979],[4] which allows the PSC to institute

---

wherein the utility does business for an order attaching the assets of the utility and placing such utility under the sole control and responsibility of a receiver. If the court determines that the petition is proper in all respects and finds, after a hearing thereon, that the allegations contained in the petition are true, it shall grant the same and shall order that the utility be placed in receivership. The court, in its discretion and in consideration of the recommendation of the commission, shall appoint a receiver who shall be a responsible individual, partnership or corporation, knowledgeable in public utility affairs and who shall maintain control and responsibility for the running and management of the affairs of such utility. In so doing, the receiver shall operate the utility so as to preserve the assets of the utility and to serve the best interests of its customers. The receiver shall be compensated from the assets of said utility in an amount to be determined by the court.

Control of and responsibility for said utility shall remain in the receiver until the same can, in the best interest of the customers, be returned to the owners, transferred to other owners or assumed by another utility or public service corporation: Provided, that if the court after hearing determines that control of and responsibility for the affairs of the utility should not, in the best interests of its customers, be returned to the legal owners thereof, the receiver shall proceed to liquidate the assets of such utility in the manner provided by law.

The laws generally applicable to receivership shall govern receiverships created pursuant to this section.

[4] *W.Va. Code* 24-2-7(a) [1979], which was previously *W.Va. Code*, 24-2-7 [1923] reads:

(a) Whenever, under the provisions of this chapter, the commission shall find any regulations, measurements, practices, acts or services to be unjust, unreasonable, insufficient or unjustly discriminatory, or otherwise in violation of any provi-

controls over the utility short of receivership, the PSC is empowered to fix "reasonable ... practices or services ... in lieu of those found to be unjust, [or] unreasonable, ...." Recognizing that the enforcement of the duty to render adequate service has been generally ineffective against smaller utilities operating under adverse economic conditions, the Legislature granted these expanded powers to the PSC to allow the PSC sufficient authority to insure adequate service and to help rescue ailing utilities from bankruptcy.

Lumberport is in precisely the precarious financial position that the new statutory provision was designed to alleviate. With Lumberport in debt for approximately $400,000 the only reasonable solution is to limit operating expenses. Therefore the PSC limited bonuses to employees to $100 and reduced the salary of the chief executive officer from $40,000 per year to no more than $20,000 per year until the debt has been paid. That the amount of the salaries was unreasonable is demonstrated by the wide disparity between administrative costs of Lumberport and other similarly situated utilities in the State.

Since this is a case of first impression under the revised provision, *W.Va. Code* 24-2-7 [1979], there is no previous case law authority in this jurisdiction for limiting corporate salaries; however, other states have ruled in rate making cases that unreasonable salaries paid to officers and shareholders of a utility can be excluded from operating expenses. *Henderson Telephone Co.*, 36 PUR 3d 458 (1960); *Siren Telephone Co.*, 30 PUR 3d 336

---

sions of this chapter, or shall find that any service is inadequate, or that any service which is demanded cannot be reasonably obtained, the commission shall determine and declare, and by order fix reasonable measurements, regulations, acts, practices or services, to be furnished, imposed, observed and followed in the State in lieu of those found to be unjust, unreasonable, insufficient, unjustly discriminatory, inadequate or otherwise in violation of this chapter, and shall make such other order respecting the same as shall be just and reasonable.

(1959); *Consolidated Telephone Co. v. Georgia Public Service Commission*, 2 PUR (N.S.) 454 (1934). More recently, the Florida Commission found that where a president of a corporation received an unusually high salary, and was also a controlling stockholder, the burden was upon the corporation to show the fair worth of the services rendered, since otherwise there was a presumption that the salary should be viewed as a dividend. *Re Miller Gas Co.*, Docket No. 770496-GU (CR), Order No. 8304, 10 May 1978.

We find that the general direction of modern authority is that the PSC should be empowered to remedy unreasonable and excessive salaries and it is in this light that we interpret *W.Va. Code* 24-2-7 [1979]. While the PSC is not to be seen as a super board of directors for the public utility companies of the State, at the same time "[t]heir function is to regulate and disapprove any dishonest or clearly inefficient conduct and practice by the utility." *United Fuel Gas Co. v. Public Service Commission*, 154 W.Va. 221, 243, 174 S.E.2d 304, 317 (1969), *citing*, *Southern Bell Telephone and Telegraph Company v. Georgia Public Service Commission*, 203 Ga. 832, 848, 49 S.E.2d 38, 66 (1948).

For the foregoing reasons, the order of the PSC in Case No. 14873 is affirmed and Case No. 14874 is remanded with directions to take further action to guarantee compliance with the PSC's original order.

*No. 14873—Affirmed.*

*No. 14874—Affirmed and remanded with directions.*