565 S.E.2d 778

THE AFFILIATED CONSTRUCTION TRADES FOUNDATION, A Division of the West Virginia State Building and Construction Trades Council, AFL–CIO, Appellant,

v.

THE PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and Big Sandy Peaker Plant, LLC, Appellees.

No. 29989.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 22, 2002.

Decided Feb. 22, 2002.

Concurring in Part and Dissenting in Part Opinion of Chief Justice Davis March 20, 2002.

Concurring Opinion of Justice Starcher March 27, 2002.

Concurring in Part and Dissenting in Part Opinion of Justice Maynard July 3, 2002.

Stuart Calwell, Vincent Trivelli, Law Office of Stuart Calwell, Charleston, for appellant.

Caryn Watson Short, Charleston, for appellee, The Public Service Commission of West Virginia.

Christopher L. Callas, Stephanie H.D. Mullett, Jackson & Kelly, PLLC, Charleston, for appellee, Big Sandy Peaker Plant, LLC.

ALBRIGHT, Justice.

This is an appeal by the Affiliated Construction Trades Foundation (hereinafter "ACT" or "Appellant"), a division of the West Virginia State Building and Construction Trades Council, AFL–CIO, from an April 10, 2001, order of the Public Service Commission (hereinafter "PSC") dismissing a complaint filed by ACT. The Appellant requests this Court to reverse the dismissal order, alleging that the PSC should consider ACT's allegations that the Big Sandy Peaker Plant, LLC, (hereinafter "Big Sandy") violated the terms of a certificate of public convenience and necessity authorizing the construction of the Big Sandy Peaker electric generation plant in Wayne County, West Virginia. Through this appeal, ACT seeks to obligate the PSC to investigate and proceed to a hearing on the complaint. Having thoroughly reviewed the record, briefs, and arguments of counsel, we affirm the ultimate decision of the PSC. Notwithstanding the technical mootness of the issues raised on appeal, based upon the fact that the facility's construction is now complete, we address the issues raised by ACT under established principles allowing review where issues are of great public interest.

### I.  Facts

On April 7, 2000, Big Sandy filed an application with the PSC, seeking a certificate of public convenience and necessity to construct an electric generating facility [1] in Wayne County. Big Sandy asserted in its application that it was not a public utility and was exclusively a wholesale generator. The application also asserted that the proposed facility was unregulated, citing federal law and the ongoing study of deregulation initiated by the PSC at the direction of the West Virginia Legislature.[2] The application included the following pertinent assertions concerning Big Sandy's plans for funding the construction of the plant:

> Big Sandy has the necessary funding to construct and operate the Facility. Big Sandy will be responsible for the construction and operation of the Facility and for the sale of electricity generated at the Facility.

> Big Sandy is currently planning to utilize internal funding to develop and construct the Facility and to pay for AEP's [American Electric Power] construction of the Transmission Line. After the Facility begins commercial operation, Big Sandy may consider permanent financing of the cost of the Facility and its investment in AEP's construction of the Transmission Line.

> The entire financial risk of constructing and operating the Facility will be bourne by Big Sandy. If the Facility were to become uneconomic as a result of changes in environmental regulations, fuel costs, competition or reduced demand for power (which Big Sandy is confident will not be the case), Big Sandy, and not the West Virginia ratepayers, will suffer the financial loss.

---

1. The certificate authorized Big Sandy to construct and operate a 300–megawatt gas-fired electric generating facility near Neal, West Virginia. Construction on the facility has been completed, and the plant went into operation in July 2001.

2. *See* W.Va.Code § 24–2–18 (1998) (Repl. Vol 2001).

With regard to the proposed economic benefits, Big Sandy asserted as follows in its application:

Construction and operation of the Facility will provide a number of economic benefits. Approximately 75 workers will be employed during construction. Big Sandy will employ approximately three full-time employees to operate the Facility. The Facility will benefit the local economy and community through the purchase of products and services that can be provided locally and by enhancing the tax base of Wayne County.

ACT did not protest or otherwise participate in the PSC consideration of Big Sandy's application, and the PSC granted the certificate on June 23, 2000, after a protest filed by a third party was resolved by agreement. The PSC found that "Big Sandy is not a public utility," reflecting agreement with Big Sandy's assertion of the "unregulated" status of the project. However, the PSC also found that its project required a certificate of convenience and necessity. Based on those findings, the PSC granted a waiver of the obligation to provide certain information to the PSC, in part since the project would not involve revenues from West Virginia ratepayers. The PSC also found that "Big Sandy has the necessary funding for, and will be solely responsible for the construction and operation, of the station...." The PSC order did not address the representations in Big Sandy's application that the project would confer economic benefit on the local area.

Prior to the filing of its application with the PSC, Big Sandy, through Constellation Power, Inc., a related organization, negotiated with the Wayne County Commission to obtain financing for the facility through industrial and commercial development revenue bonds to be issued by the county commission. According to the bond resolution adopted by the county commission, those negotiations began on or before February 22, 2000. A formal request was presented to the county commission on March 20, 2000, which committed to the project and the bonds on March 27, 2000. The formal bond resolution, dated February 20, 2001, states that the de-veloper represented to the county commission on February 22, 2000, that it would "attempt to use local workers if possible during construction of the [p]roject." The resolution further recites that in its March 20, 2000, request to the county commission, Constellation proposed payments to county instrumentalities in lieu of taxes totaling $425,000, later modified to provide for $425,000 annually to the county commission for a term of twenty years, and an additional $600,000, payable over three years to the Wayne County economic development authority.

On December 13, 2000, ACT filed a complaint with the PSC, alleging that Big Sandy had misrepresented certain material facts to the PSC in obtaining the certificate of public convenience and necessity. Act asserted that although the certificate application indicated that the facility would be funded through "internal funding," Big Sandy had funded the project through industrial and commercial development revenue bonds. Additionally, ACT asserted that although the certificate application indicated that the construction would benefit the local economy, Big Sandy had not significantly utilized a local workforce in the construction of the facility.

In seeking a remedy for the alleged violations, ACT requested that the PSC (1) revoke the certificate and order construction to cease; (2) revoke the waiver of the obligation to submit certain information to the PSC; (3) investigate the circumstances under which Big Sandy applied for and obtained the certificate; (4) refuse to issue a new certificate until the PSC determines that Big Sandy has complied with West Virginia Code § 24-2-11 (1983) (Repl.Vol.2001), including the burden to demonstrate an improved economy; and (5) order Big Sandy to hire exclusively local workers and contractors for the construction and operation of the facility.

On January 8, 2001, Big Sandy moved to dismiss ACT's complaint, contending that ACT lacked standing and further maintaining that ACT's allegations of misrepresentation or certificate violation were erroneous.[3]

---

3. In the motion to dismiss, Big Sandy explained    that the certificate application stated its expected

The PSC dismissed ACT's complaint on April 10, 2001, finding that ACT was not a party to the certification, that ACT alleged no violation of public utility law, and that the PSC did not have authority to grant the relief sought. The PSC based its dismissal order upon several considerations. First, the PSC noted that "ACT was not a party to Big Sandy's certificate case and cannot untimely undo the certificate proceeding via a formal complaint." The PSC found that Big Sandy's plant "is not a typical electric generating facility, built by a regulated utility and to be paid for . . . with revenue received from the utility's ratepayers." The order of dismissal further recited that PSC "considerations" for such cases must be "molded and adjusted . . . on a case-by-case basis." However, the PSC did address the substance of ACT's allegations, explaining as follows:

> [N]othing in the Commission's order granting Big Sandy a certificate to build the wholesale peaking plant required Big Sandy to use local employees or limited Big Sandy's funding options. The Commission does not establish parameters for the workforce composition for a project, even a traditional utility project. Finally, if Big Sandy made misrepresentations when it appeared before the Wayne County Commission, those concerns must be addressed elsewhere.[4]

In its appeal of the PSC dismissal order, ACT asserts that this Court's determination should be limited to the issue of ACT's standing to file a complaint with the PSC regarding Big Sandy's alleged violations. In its responsive memoranda, however, the PSC and Big Sandy emphasize that the matters at issue are actually broader than the threshold standing issue and that the PSC based it dismissal order upon considerations other than standing, as revealed in the quotations provided above. For purposes of appellate review, it appears to this Court that the PSC dismissal order was based ACT's lack of participation in the certificate process, as well as the fact that no specific violation of utility law had been alleged and that the certificate, as issued, neither limited Big Sandy's funding options nor required any particular workforce composition.

## II. The Standard of Review

This Court has consistently held as follows: " " '[A]n order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles." *United Fuel Gas Company v. The Public Service Commission,* 143 W.Va. 33, 99 S.E.2d 1 (1957).' Syllabus Point 5, in part, *Boggs v. Public Service Comm'n,* 154 W.Va. 146, 174 S.E.2d 331 (1970)." Syllabus Point 1, *Broadmoor/Timberline Apartments v. Public Service Commission,* 180 W.Va. 387, 376 S.E.2d 593 (1988).

Syl. Pt. 1, *Sexton v. Public Service Commission,* 188 W.Va. 305, 423 S.E.2d 914 (1992).

In syllabus point two of *Monongahela Power Co. v. Public Service Commission,* 166 W.Va. 423, 276 S.E.2d 179 (1981), we explained:

> In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide wheth-

---

use of local products and services but made no representations regarding the use of local labor and contractors. Big Sandy further contended that the remedy ACT sought regarding the hiring of local workers is relief which cannot be ordered by the PSC. Further, Big Sandy alleged that its utilization of revenue bonds to fund the facility is not in conflict with the assertion in the certificate application that internal funding would be utilized, since "internal funding" simply referred to the fact that the project would not be funded through revenues generated by payments by West Virginia ratepayers. Further, Big

Sandy maintained that ACT had not alleged any violation of public utility law.

**4.** In fact, the Wayne County Commission did address the failure of Big Sandy to utilize a significant number of local workers in its bond resolution adopted February 20, 2001, requiring that at least 70% of the construction workers employed for the remainder of the project be "local." At that time, however, the construction was nearing completion.

er each of the order's essential elements is supported by substantial evidence. Finally, we will determine whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

*See also* syl. pt. 1, *Berkeley County Public Service Sewer District v. West Virginia Public Service Commission*, 204 W.Va. 279, 512 S.E.2d 201 (1998). This Court elaborated upon the *Monongahela Power* standard as follows in syllabus point one of *Central West Virginia Refuse, Inc. v. Public Service Commission*, 190 W.Va. 416, 438 S.E.2d 596 (1993):

> The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission*, 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper.

In light of the standards set forth above, this Court must determine whether the PSC abused or exceeded it duties; whether the PSC's findings are contrary to the evidence; and whether the result of the PSC's final order is proper in light of the reasonable needs and expectations of the regulated entity and the relevant public interests.

## III. Discussion

### A. Technically Moot Issues

Although we conclude here that the decision below must be affirmed because the issues are technically moot,[5] we also conclude that the issues addressed are questions of great public interest and that the issues adjudicated here have substantial collateral consequences, particularly in possible PSC proceedings wherein the jurisdiction of the PSC, the standing of citizens to bring complaints and the importance of attention by the PSC to the public interest may be at issue. Therefore, we proceed to consider and decide those issues.

### B. The Scope of PSC Jurisdiction

West Virginia Code § 24-2-1 (1991) (Repl. Vol.2001) delineates the jurisdiction of the PSC, providing in pertinent part as follows:

> The jurisdiction of the commission shall extend to all public utilities in this state, and shall include any utility engaged in any of the following public services: ... *generation and transmission of electrical energy by hydroelectric or other utilities for service to the public,* whether directly or through a distributing utility; supplying water, gas or electricity, by municipalities or others.

W.Va.Code § 24-2-1 (emphasis supplied). The definition of the term "public utility" is provided by West Virginia Code § 24-1-2 (1979) (Repl.Vol.2001), as follows: "any person or persons, or association of persons, however associated, whether incorporated or not, including municipalities, engaged in any business, whether herein enumerated or not, which is, or shall hereafter be held to be, a public service." In syllabus point three of *Wilhite v. Public Service Commission*, 150 W.Va. 747, 149 S.E.2d 273 (1966), this Court held:

**5.** In syllabus point one of *Israel by Israel v. West Virginia Secondary Schools Activities Comm'n*, 182 W.Va. 454, 388 S.E.2d 480 (1989), this Court explained:

> Three factors to be considered in deciding whether to address technically moot issues are as follows: first, the court will determine whether sufficient collateral consequences will result from determination of the questions pre-

sented so as to justify relief; second, while technically moot in the immediate context, questions of great public interest may nevertheless be addressed for the future guidance of the bar and of the public; and third, issues which may be repeatedly presented to the trial court, yet escape review at the appellate level because of their fleeting and determinate nature, may appropriately be decided.

The test as to whether or not a person, firm or corporation is a public utility is that to be such there must be a dedication or holding out either express or implied that such person, firm, or corporation is engaged in the business of supplying his or its product or services to the public as a class or any part thereof as distinguished from the serving of only particular individuals; and to apply this test the law looks at what is being done, not to what the utility or person says it is doing.

*See also West Virginia Highlands Conservancy, Inc. v. Public Service Commission,* 206 W.Va. 633, 527 S.E.2d 495 (1998) (concluding that a public utility holding company was not subject to the jurisdiction of the PSC).

In syllabus point six of *State ex rel. City of Wheeling v. Renick,* 145 W.Va. 640, 116 S.E.2d 763 (1960), this Court summarized the PSC's authority as follows:

The public service commission has the statutory power and authority to control the facilities, charges and services of all public utilities and to hear and determine the complaints of persons entitled to the services which such utilities afford; and the only limitation upon such power and authority is that the requirements shall not be contrary to law and that they shall be just and fair, just and reasonable, and just and proper.

*See also* syl. pt. 2, *Broadmoor/Timberline Apartments v. Public Service Commission,* 180 W.Va. 387, 376 S.E.2d 593 (1988). This Court further explained as follows in syllabus point two of *Wilhite:* "The Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to the regulation of public utilities. It has no inherent power or authority." 150 W.Va. at 748, 149 S.E.2d at 274.

## C. Big Sandy's Status as a Public Utility

In response to ACT's assertions that the PSC should have undertaken investigation of Big Sandy's alleged misrepresentations, the PSC and Big Sandy maintain that Big Sandy is not a public utility. We disagree. Big Sandy has represented that it will produce electricity which will be transmitted to AEP for eventual sale to the public. West Virginia Code § 24–2–1 specifically states that one engaged in the generation of electric power is subject to PSC jurisdiction, whether the service is provided "directly or through a distributing utility." [6] We note also that any entity "engaged in any business, whether herein enumerated or not, which is, or shall hereafter be held to be, a public service" constitutes a public utility under West Virginia Code § 24–1–2, as quoted above. That is an inclusive definition. We conclude that electric generation and transmission facilities intended solely for the sale of electricity on the wholesale market are within the statutory definition of a public utility set forth in West Virginia Code § 24–2–1 whenever it appears that the electricity produced will, in the course of distribution, ultimately be sold to the public. Accordingly, we find that the PSC determination that Big Sandy is not a "public utility" was erroneous as a matter of law.

## D. The Standing Issue

Based upon the portion of the PSC dismissal order which premises the dismissal of ACT's complaint, in part, upon the fact that ACT did not have standing to file a complaint since it was not a party to the certificate application process, this Court must examine West Virginia Code § 24–4–6 (1923) (Repl.Vol.2001), which provides guidance regarding those entitled to file complaints with the PSC, as follows:

Any person, firm, association of persons, corporation, municipality or county, complaining of anything done or omitted to be done by any public utility subject to this

---

**6.** In *Lumberport–Shinnston Gas Co. v. Public Service Commission,* 165 W.Va. 762, 271 S.E.2d 438 (1980), this Court explained:

Our Court has previously held that the fact that the utility does not distribute the gas directly to the public is irrelevant. In *Preston County*

*Light and Power Company v. Renick,* 145 W.Va. 115, 113 S.E.2d 378 (1960), the Court found that an electric company that sold electricity only to the applicant was subject to the PSC's jurisdiction."

*Id.* at 765 n. 2, 271 S.E.2d at 441 n. 2.

chapter, in contravention of the provisions thereof, or any duty owing by it under the provisions of this chapter, may present to the commission a petition which shall succinctly state all the facts. Whereupon, if there shall appear to be any reasonable ground to investigate such complaint, a statement of the charges thus made shall be forwarded by the commission to such public utility, which shall be called upon to satisfy such complaint or to answer to the same in writing within a reasonable time to be specified by the commission. If such public utility within the time specified shall make reparation for the injury alleged to have been done, or correct the practice complained of and obey the law and discharge its duties in the premises, then it shall be relieved of liability to the complainant for the particular violation of the law or duty complained of. If such public utility shall not satisfy the complainant within the time specified, it shall be the duty of the commission to investigate the same in such manner and by such means as it shall deem proper.

The clear language of this statute grants standing to ACT. To hold otherwise would require patent disregard of the express statutory language granting the right to file a complaint to "any person, firm, association of persons, corporation, municipality or county." With respect to the fact that ACT was not a party to the original application process, we again find nothing in the statute requiring prior participation in such an application proceeding as a condition for filing a complaint. What is required by the statute is that the complaint set forth "anything done or omitted to be done by any public utility subject to this chapter, in contravention of the provisions thereof, or any duty owing by it under the provisions of [chapter twenty-four of the West Virginia Code]." W.Va.Code § 24–4–6. The statute permits a complaint where the alleged actions offend the conditions under which the PSC has authorized the utility to act or offend any other requirement of the code relating to public utilities. ACT alleged that Big Sandy had included in its application substantial misrepresentations, which, if proved, would violate the duty of truthfulness expressly imposed by West Virginia Code

§ 24–4–2 (1935) (Repl.Vol.2001). We hold that any person or entity having a good faith reason to file a complaint against a public utility under West Virginia Code § 24–4–6 has standing to do so, notwithstanding the fact that such person or entity was not a party to prior proceedings for a certificate of convenience and necessity or other proceedings to which the complaint relates.

■ The PSC also maintains the ACT attempted to "undo" the grant of the application and interfere with the finality of PSC orders in an untimely fashion. If ACT sought only revocation of the permit, the finality argument might be considered more viable. However, the ACT complaint sought to require compliance with the representations in the application and the bases upon which the permit was granted. In refusing consideration of the ACT complaint, the PSC expressed concern that the complaint process might undermine the finality of its order granting a certificate of convenience and necessity. We do not perceive the complaint process as a substitute for a timely appeal and do not, by our ruling today, imply that a complaint may be used as a substitute for a timely appeal. Nevertheless, where a timely complaint alleges in good faith that commitments made in the initial proceedings are not being faithfully performed, the use of the complaint process to cause a careful examination of that performance cannot be seen as an attack on the finality of the order of the PSC granting the certificate of convenience and necessity. Rather, such a complaint addresses only the performance of the permit holder subsequent to the granting order.

E. Violations Alleged by ACT Complaint

■ Having concluded that Big Sandy qualifies as a public utility to which PSC authority would apply and that ACT was entitled to file a complaint, we address the merits of the action. As explained above, ACT would limit inquiry to the standing issue; however, the PSC order which forms the basis for this appeal was not restricted to that single issue and the parties have addressed the substance of the ACT complaint in the briefs filed in this appeal. The PSC essentially maintained in the dismissal order

and argues on appeal that ACT's complaint failed to state a cause of action. Further, the PSC asserts that even if the allegations in the complaint are taken as true, they do not establish a violation of any condition for issuance of the certificate under PSC law. The PSC contends that nothing directly required by the certification process was alleged to have been violated. Consequently, the PSC argues that there is no violation and no remedy available to ACT, since Big Sandy's application promised neither a particular local employment base nor a precise method of funding the construction project. This Court must examine the reasoning of the PSC to determine whether such a restrictive view of its own power is warranted or whether a broader view is appropriate, addressing whether the ACT complaint alleges conduct by Big Sandy which, by commission or omission, offends chapter twenty-four of the West Virginia Code, the bulk of the statutory public utility of this state.

As noted, ACT's complaint focuses on two predominant realms of concern, Big Sandy's assertion in its application that the project would be paid for entirely by "internal funding" and the further assertion that the project would be of economic benefit to the local community. The PSC order granting the certificate of convenience and necessity expressly finds that Big Sandy has the required funding for the station and will be "solely responsible" for the construction and operation of the project. That PSC order is silent on the economic benefit to the local community, its impact on the tax base of Wayne County, or its impact on the public revenues of the county or state.

The gravamen of the ACT complaint appears to be that with respect to these two matters, internal funding and benefit to the local community, Big Sandy, by misleading and incomplete statements and disclosures, failed in the duty to make truthful statements to the PSC [7] with respect to these two central matters or failed to proceed in conformity with those representations. ACT asserts that the PSC had the authority to require compliance with those representations or withdraw the permit.

7. W.Va.Code § 24–4–2.

West Virginia Code § 24–1–1 (1986) (Repl. Vol.2001) provides the legislative purpose of the PSC and explains as follows:

(a) It is the purpose and policy of the Legislature in enacting this chapter to confer upon the public service commission of this state the authority and duty to enforce and regulate the practices, services and rates of public utilities in order to:

(1) Ensure fair and prompt regulation of public utilities in the interest of the using and consuming public;

. . . .

(3) Encourage the well-planned development of utility resources in a manner consistent with state needs and in ways consistent with the productive use of the state's energy resources, such as coal;

. . . .

(b) The Legislature creates the public service commission to exercise the legislative powers delegated to it. The public service commission is charged with the responsibility for appraising and balancing the interests of current and future utility service customers, *the general interests of the state's economy* and the interests of the utilities subject to its jurisdiction in its deliberations and decisions.

(c) The Legislature directs the public service commission to identify, explore and consider the potential benefits or risks associated with emerging and state-of-the-art concepts in utility management, rate design and conservation. The commission may conduct inquiries and hold hearings regarding such concepts in order to provide utilities subject to its jurisdiction and other interested persons the opportunity to comment, and shall report to the governor and the Legislature regarding its findings and policies to each of these areas not later than the first day of the regular session of the Legislature in the year one thousand nine hundred eighty-five, and every two years thereafter.

W.Va.Code § 24–1–1 (emphasis supplied). This Court has consistently adhered to the principle that the primary purpose of the

PSC is to "serve the interests of the public." *Boggs v. Public Service Commission,* 154 W.Va. 146, 154, 174 S.E.2d 331, 336 (1970). In syllabus point one of *West Virginia–Citizen Action Group v. Public Service Commission,* 175 W.Va. 39, 330 S.E.2d 849 (1985), this Court explained:

> The Public Service Commission was created by the Legislature for the purpose of exercising regulatory authority over public utilities. Its function is to require such entities to perform in a manner designed to safeguard the interests of the public and the utilities. Its primary purpose is to serve the interests of the public. *Boggs v. Public Service Commission,* 154 W.Va. 146, 174 S.E.2d 331 (1970).

*See also* syl. pt. 1, *City of South Charleston v. West Virginia Public Service Commission,* 204 W.Va. 566, 514 S.E.2d 622 (1999).

The basis for ACT's complaint regarding the absence of "internal funding" is the fact that the use by Big Sandy of financing through publicly issued industrial and commercial development revenue bonds coupled with a reduction in taxes, achieved by making fixed "payments in lieu of taxes" [PILOT], is not "internal funding." In examining that assertion in the context of oral argument before this Court, it became apparent that an appropriate definition for the term "internal funding" is the subject of prodigious debate. Big Sandy asserts that the PILOT program and revenue bonds are not inharmonious with the statement that internal funding would be utilized since the use of internal funding, made in conjunction with a certificate application to the PSC, denoted only that the West Virginia ratepayers would not bear the cost for construction of the project. The PSC apparently agreed with this definition. Once the PSC determined that the cost of the project would not be paid from revenues earned from West Virginia rate payers, its inquiry appears to have ended. We find that limited inquiry inconsistent with the primary purpose of the PSC to serve the interests of the public, its obligation to require utilities "to perform in a manner designed to safeguard the interests of the public and the utilities" and its clearly expressed statutory duty to appraise and balance "the interests of

current and future utility service customers, *the general interests of the state's economy* and the interests of the utilities subject to its jurisdiction" in its deliberations and decisions. Syl. pt. 1, *West Virginia–Citizen Action Group,* 175 W.Va. at 40, 330 S.E.2d at 849; W.Va.Code § 24–1–1 (emphasis supplied).

■ Where public funding is in fact a material part of the financing of public utility construction, the PSC cannot discharge its duty to the public interest simply by labeling the funding internal. At least a general review of those plans is required, sufficient to inform the PSC of the terms and conditions of such public funding, that the public entity involved has consented or will consent to the plan in light of all material facts, and that such plan does not offend the public interest from the perspective of the PSC. Where it is subsequently claimed that the terms and conditions of the public funding plan intended to serve the public interest have not been substantially complied with, the PSC has jurisdiction to compel compliance if that is necessary.

In similar vein, the PSC expressed the position that it was not disturbed by the substitution of "payments in lieu of taxes" for the actual income likely to be generated for local use by normal taxes regularly levied on actual or projected assessments. Big Sandy asserts that it bears the entire financial risk in this project, intending to pay off the bonds from its own resources and to ultimately regain legal title to its plant. Big Sandy hopefully will be successful in shouldering substantially all of the financial risk of the project. However, the reality is that the bond issue in this case implicates the credit standing of Wayne County and, ultimately, the State of West Virginia. If there is a default, either Wayne County will assume the burden or its credit standing will be harmed, even if no county assets beyond the plant site may be held to answer for the debt. Moreover, during the time the real estate upon which the plant is located stands in the name of the County Commission, the capacity of Wayne County to incur bonded indebtedness is reduced because the assessed value of property in the county is computed without

regard to the plant property.[8] Finally, this facility, for which bonds in the amount of $110 million were issued by Wayne County, presumably justifying an initial assessed value on the tax books of Wayne County of about $66 million, may well have produced considerably more in taxes to Wayne County over the twenty years for which PILOT payments have been promised at the base rate of $425,000, plus a one-time payment of $600,000. Proper regard for the public interest suggests that the PSC has both the right and the duty to inquire into the suitability of these arrangements, taking into account the particular factors that may have motivated the Wayne County Commission in agreeing to such an arrangement, the factors leading Big Sandy and the Wayne County Commission to agree upon the project, and any other factors appropriate to the inquiry. We do not suggest that the arrangements here were either good or not good for the state, the county, economic development, local employment, or whatever other factors involve the public interest. Rather we simply conclude that "the public interest," to which the PSC is required to give attention, demands a fully developed concern for all citizens and business entities, be they ratepayers, taxpayers, or neither.

A comprehensive consideration of the "public interest" would also justify PSC inquiry regarding the promised benefits to the local workforce arising out of the kinds of commitments or concessions thought necessary, and in fact utilized in Wayne County, to attract this particular investment. The record discloses that the intent to use revenue bonds was publicly known as early as February 22, 2000. The record also shows that when the PSC failed to act in relation to the representation that the project would be of economic benefit to the local community, the County Commission of Wayne County did extract a commitment from Big Sandy in February 2001, that at least 70% of the workforce at the plant would be local during the remaining months of construction. This Court recognizes that a combination of factors came together to result in the construc-

tion and operation of this plant in Wayne County, West Virginia, including the use of revenue bonds, the availability of a market for this peak time electricity generation, the agreements for payments in lieu of taxes, and the commitment to employ largely local workers during construction of the plant. In our view, the public interest was not served by the PSC simply ignoring any alleged and provable variance between the commitments made to bring this facility into being under a proper certificate of public convenience and necessity and the performance of those commitments after the issuance of the certificate.

## IV. Conclusions

■ In seeking a remedy for the alleged violations, ACT requested that the PSC (1) revoke the certificate and order construction to cease; (2) revoke the waiver of the obligation to submit certain information to the PSC; (3) investigate the circumstances under which Big Sandy applied for and obtained the certificate; (4) refuse to issue a new certificate until the ·PSC determines that Big Sandy has complied with West Virginia Code § 24–2–11 including the burden to demonstrate an improved economy; and (5) order Big Sandy to hire exclusively local workers and contractors for the construction and operation of the facility. The PSC responded by finding that there were no remedies available even if the ACT complaint had merit.

■ Based upon the actuality that the Big Sandy plant began operating in July 2001, we must agree with the PSC that there is no realistic remedy now available in this case. This Court addresses these issues with regard to future proceedings and complaints before the PSC. We find that the PSC had authority to revoke or suspend the permit or to impose monetary penalties during the construction of the facility, as authorized by the PSC certificate and based upon Big Sandy's representations. In dismissing ACT's complaint, the PSC erred in finding an absence of ACT standing and in holding that Big Sandy was not a public utility subject to PSC

---

**8.** *See* W. Va. Const. art. X, § 8, regarding the power to incur debt and the restrictions on bond-

ed indebtedness of counties in West Virginia.

authority.[9] Furthermore, the PSC erred in failing to thoroughly scrutinize ACT's allegations of misrepresentation regarding internal funding and economic impact. As explained above, the public interest requires that representations of benefit to a local community which underlie a certificate application or the intended use of public financing require the PSC to fully consider such representations and require continued compliance therewith to assure that the public funding mechanism assures such compliance. Vague assurances by the certificate applicant that the public interest will be served, through a particular provision or construction requirements, must not be considered sufficient to prevent further PSC inquiry regarding the extent to which the application serves the public interest. Nevertheless, in light of the completion of the project, we do not disturb the final ruling of the PSC.

Affirmed.

DAVIS, Chief Justice, concurring, in part, and dissenting, in part.

(Filed March 20, 2002)

In this proceeding, the Affiliated Construction Trades Foundation (hereinafter referred to as "ACT") challenged a ruling by the Public Service Commission (hereinafter referred to as "PSC"), which concluded that ACT had no standing to litigate issues involving a certificate of convenience and necessity that was issued to Big Sandy Peaker Plant (hereinafter referred to as "Big Sandy"). The majority opinion determined that granting relief to ACT was impossible because the project complained of had been completed.

Therefore, the majority opinion properly affirmed the PSC's dismissal of ACT's complaint. With this part of the majority opinion, I concur.

Although the majority opinion found that completion of the project by Big Sandy rendered ACT's complaint moot, the majority nevertheless proceeded to address the merits of the issues raised. In so doing, the majority opinion ruled that ACT had standing to file a complaint against Big Sandy. For the reasons set out below, I dissent from the majority opinion's ruling on the standing issue.

**ACT had no standing because ACT Failed to Intervene During the Pendency of Big Sandy's Request for a Certificate of Convenience and Necessity**

The PSC maintained that ACT sought to revoke the certificate of convenience and necessity issued to Big Sandy. Consequently, the PSC argued, ACT had no standing to file a complaint in the matter. To justify addressing this case on the merits, the majority opinion stated that "[i]f ACT sought only the revocation of the permit, the finality argument might be considered more viable." In other words, the majority opinion agreed that ACT had no standing to revoke the certificate of convenience and necessity. However, to support its finding that ACT did have standing in this case, the majority opinion disingenuously concluded that ACT did not actually seek to revoke the certificate of convenience and necessity. Unfortunately, the record fails to support the majority's conclusion. In fact, the record *clearly* reveals that ACT indeed sought to revoke the

9. The allegations implying that Big Sandy is exempt by reason of some ongoing process of deregulation are mere surplusage because public utilities have not been deregulated in West Virginia, despite the interest of some members of the PSC and the Legislature in exploring the subject. Further, the authority of the state PSC to act is not preempted or affected by the federal regulation of wholesale power transactions under the Federal Power Act, Section 824, Title 16, of the United States Code. Nor is the PSC's authority supplanted by The Public Utility Holding Company Act, Section 79, Title 15 of the United States Code. In *Alabama Electric Co–op v. SEC*, 353 F.2d 905 (D.C.Cir.1965), the court explained that the "purpose of the Public Utility Holding Company Act, as shown by its legislative history, was

to supplement state regulation-not to supplant it. *Id.* at 907; *see also New England Power v. New Hampshire,* 455 U.S. 331, 341, 102 S.Ct. 1096, 71 L.Ed.2d 188 ("The legislative history of the [Federal Power] Act … indicates that Congress intended only that its legislation 'tak[e] no authority from State commissions.'") (quoting H.R.Rep. No. 1318, 74th Cong., 1st Sess. 8 (1935); *Delaware County Elec. Co-op. Inc. v. Power Authority of State of N.Y.,* 96 A.D.2d 154, 468 N.Y.S.2d 233, 236 (1983)) (holding that the Federal Power Act grants exclusive jurisdiction to FERC concerning actions under that statute but does not divest state courts of jurisdiction where the complaint asserts rights and seeks relief based upon state law).

certificate of convenience and necessity issued to Big Sandy.

Pursuant to W.Va.Code § 24–2–11(a) (1983) (Repl.Vol.2001), the PSC is required to provide notice to the public of a request for a certificate of convenience and necessity.[1] The notice requirement is intended to allow any interested party to attend a scheduled hearing to voice any concerns regarding a third party's request for a certificate of convenience and necessity. The record revealed that the PSC *required* Big Sandy to make two legal publications advising the public of the pendency of its request for a certificate of convenience and necessity. As a result of the legal publications, two parties intervened and were given an opportunity by the PSC to voice their concerns. *ACT did not attempt to intervene while the PSC was considering Big Sandy's request for a certificate of convenience and necessity.* Had ACT so intervened and objected to the PSC's ruling, ACT could then have appealed an unfavorable ruling. However, rather than intervening as authorized by W.Va.Code § 24–2–11(a), ACT waited nearly six months *after* the PSC had granted the certificate of convenience and necessity to raise its objections. At that point, ACT filed a complaint seeking to revoke the certificate of convenience and necessity.

ACT relied upon W.Va.Code § 24–4–6 (1923) (Repl.Vol.2001) in order to file its complaint. W.Va.Code § 24–4–6 permits a party to enforce compliance with the statutory, regulatory, and other requirements that are imposed upon an entity that obtains a certificate of convenience and necessity.[2] This statute, as conceded to by the majority opinion, cannot be used to revoke the issuance of a certificate of convenience and necessity. A party seeking to revoke the issuance of a certificate of convenience and necessity must appeal the order granting such certificate.

The complaint filed by ACT pursuant to W.Va.Code § 24–4–6 expressly sought the following relief from the PSC:

> i. That the Commission *revoke* the Certificate of Convenience and Necessity it issued on June 23, 2000 concerning [Big Sandy's] facility and Order all construction and other work to cease.

> ii. That the Commission issue an Order *revoking* the waiver of the requirement to provide information listed in paragraphs 5 through 9 of Form 5 of the Commission's Tariff Rules and the Information required by Rule 42 of the Tariff and Ordering [Big Sandy] to provide said information.

> iii. That the Commission investigate the circumstances under which [Big Sandy] applied for and obtained said Certificate.

> iv. That the Commission *not issue* a new Certificate of Convenience and Necessity for said facility unless and until it determines that [Big Sandy] has met its burden and complies with all aspects of West Virginia Code Section 24–2–11 in-

---

**1.** The pertinent language of W.Va.Code § 24–2–11(a) states:

> Notice shall be given by publication which shall state that a formal hearing may be waived in the absence of protest, made within thirty days, to the application. The notice shall be published as a Class I legal advertisement in compliance with the provisions of article three, [§§ 59–3–1 et seq.], chapter fifty-nine of this code.

**2.** W.Va.Code § 24–4–6 reads in full:

> Any person, firm, association of persons, corporation, municipality or county, complaining of anything done or omitted to be done by any public utility subject to this chapter, in contravention of the provisions thereof, or any duty owing by it under the provisions of this chapter, may present to the commission a petition which shall succinctly state all the facts. Whereupon, if there shall appear to be any

reasonable ground to investigate such complaint, a statement of the charges thus made shall be forwarded by the commission to such public utility, which shall be called upon to satisfy such complaint or to answer to the same in writing within a reasonable time to be specified by the commission. If such public utility within the time specified shall make reparation for the injury alleged to have been done, or correct the practice complained of and obey the law and discharge its duties in the premises, then it shall be relieved of liability to the complainant for the particular violation of the law or duty complained of. If such public utility shall not satisfy the complainant within the time specified, it shall be the duty of the commission to investigate the same in such manner and by such means as it shall deem proper.

cluding its burden to demonstrate an improved economy in light of the impact on the economic health of the community and the State through the use of revenue bonds and a PILOT plan.

v. That the Commission Order [Big Sandy] to meet its obligations to the economic health of the State and the Community through the exclusive hiring of local workers and contractors for the construction and operation of the facility.

(Emphasis added).

In its opinion, the majority states that ACT had standing in this case because ACT was not seeking to revoke the certificate of convenience and necessity issued by the PSC to Big Sandy. However, as indicated above in paragraph *i*, ACT specifically requested "[t]hat the Commission *revoke* the Certificate of Convenience and Necessity it issued on June 23, 2000 concerning [Big Sandy's] facility[.]" (Emphasis added). Moreover, in paragraph *iv*, ACT specifically requested "[t]hat the Commission *not issue* a new Certificate of Convenience and Necessity for said facility unless and until it determines that [Big Sandy] has met its burden and complies with all aspects of West Virginia Code Section 24–2–11[.]" (Emphasis added).

It is simply illogical for the majority opinion to conclude that ACT was not seeking to revoke the certificate of convenience and necessity issued to Big Sandy. ACT was crystal clear in its complaint. It requested the certificate of convenience and necessity be "revoked," and that no "new" certificate of convenience and necessity be issued until Big Sandy met the requirements imposed by ACT. I submit that the majority opinion is a calculated distortion of the record and is imposing greater, nonstatutory, duties upon the PSC. These new duties, as outlined by the majority opinion, permit *any* future entities[3] to have uncontrollable power in challenging the issuance of a certificate of conve-

nience and necessity. It is unfortunate that the majority opinion has resorted to such legislative authorship rather than staying within the confines of our constitutional role as the judicial branch of government.

For the reasons stated, I concur, in part, and dissent, in part, from the majority opinion. I am authorized to state that Justice Maynard joins me in this opinion and reserves the right to author a separate opinion.

STARCHER, J., concurring.

(Filed March 27, 2002)

The Chief Justice's separate opinion in the instant case characterizes the majority opinion as holding that " … ACT had standing *because ACT was not seeking to revoke* the [Big Sandy] certificate of convenience and necessity …." (Separate opinion, emphasis added.)

This characterization is simply wrong. In fact, the majority opinion clearly holds that ACT had standing because ACT—*in addition to* a request for revocation of Big Sandy's certificate—asked the PSC to make Big Sandy comply with the representations that Big Sandy had made to the PSC. The majority opinion clearly holds that it was this separate request for compelled compliance— *not* the absence of a request for revocation— that conferred standing on ACT. The majority clearly stated that "[t]he clear language of the statute grants standing to ACT." The discussion of standing in the Chief Justice's separate opinion is, therefore, simply irrelevant to the majority opinion.

To compound the error, the separate opinion implies that the standing holding in the majority opinion is motivated by a desire to favor union workers—regardless of the law. Wrong again.

In fact, the "motive" of the majority opinion (and the clear language of the statute) is to assure that unions, employers, and every-

---

3. Here, ACT argues that the purpose of its complaint was to save union jobs for West Virginia working people. However, the next entity which might use the majority opinion to revoke a certificate of convenience and necessity may very well be a non-union entity that is seeking to have non-union workers employed on a project. In other words, the majority opinion has opened the door

for relentless challenges to validly issued certificates of convenience and necessity by pro-labor and pro-business organizations, as well as by union and non-union advocates. *See In re Burks*, 206 W.Va. 429, 432 n. 1, 525 S.E.2d 310, 313 n. 1 (1999) (" '[S]auce for the goose' is also 'sauce for the gander.' ").

one else can be held accountable by members of the public for their promises to public regulators.

Accordingly, I concur.

MAYNARD, Justice, concurring, in part, and dissenting, in part.

(Filed July 3, 2002)

I wholeheartedly agree with and join in the separate opinion written by Chief Justice Davis. I would simply add that I fear this opinion will have a chilling effect on the future development of electric generating facilities in this State. By legislating that people or groups can wait until after a certificate of convenience and necessity is granted to object, in derogation of W.Va.Code § 24–2–11(a) (1983), I fear the majority opinion will cause power generating entities and investors to shy away from West Virginia.

In fact, the fallout from the majority opinion is already being felt. On June 15, 2002, the Herald–Dispatch, a newspaper published in Huntington, West Virginia, reported that "Panda Energy International has put on hold construction of the gas-fired power plant it wants to build at Culloden while it sorts out the impact of a state Supreme Court ruling." Jim Ross, *Culloden Power Plant Put on Hold,* The Herald–Dispatch, June 15, 2002, at 1A. The director of corporate communications for the company stated that the project cannot proceed until the company figures out the meaning of the majority ruling. The 1,000 megawatt power plant, which was announced two years ago, would employ forty-six employees with an average salary of $50,000 and pay approximately $4,000,000 in real estate and personal property taxes with sixty-eight percent of the tax revenues flowing to the school system. The majority has impeded, if not stopped, the entire project.

The majority opinion disallows a stable approach to development and operation of these plants. The fact that a company survives the statutory thirty-day protest period and receives a certificate now means nothing. The finality that historically comes with being granted a certificate of convenience and necessity has been stripped away. In our everyday world, this means that it could now

be difficult to assemble a workforce. The contractor will not be able to guarantee construction time or make an educated guess as to when ACT, or any other person or group, will complain under W.Va.Code § 24–4–6 (1923) and shut down construction. No worker wants to be subject to this uncertainty. Certainly the biggest obstacle which must now be overcome is financing. In order for investors to even look at these projects, the company must be able to project the construction deadline and state with a reasonable amount of certainty when the product will be ready for sale. Once a company such as Big Sandy Peaker Plant has jumped through all the hoops, the statutory structure provides this finality and stability.

By allowing W.Va.Code § 24–4–6 to replace W.Va.Code § 24–2–11(a), the majority has usurped the authority of the Legislature and, in so doing, has removed the statutory stability and finality under which these projects must function in order to be successful. I cannot join in this result. However, I agree that the issue as it applies to Big Sandy is moot. For these reasons, I join Chief Justice Davis' separate opinion and write separately to reiterate my belief that the majority opinion will needlessly have a devastating and debilitating effect on construction of power generating facilities in this State. I fear it has already cost Cabell County the Panda Energy project and has cost forty-six good-paying jobs and $4,000,000 in new tax revenues.