330 S.E.2d 849

**WEST VIRGINIA–CITIZEN ACTION GROUP, National Wildlife Federation, West Virginia Wildlife Federation, and Coalition of American Electric Consumer**

v.

**PUBLIC SERVICE COMMISSION OF WEST VIRGINIA and Appalachian Power Company.**

**No. 16512.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 22, 1985.

Decided May 30, 1985.

David Grubb, John C. Purbaugh, Charleston, for petitioners.

Charles R. McElwee and William C. Porth, Robinson & McElwee, Charleston, for APCO.

Marc E. Lewis, Legal Div., Charleston, for PSC.

McHUGH, Justice:

In this action, the appellants, the West Virginia-Citizen Action Group, et al., appeal from a final order of the Public Service Commission of West Virginia. Pursuant to that order, the Public Service Commission dismissed the appellants' complaint concerning the March, 1982 electric bills mailed by the appellee, Appalachian Power Company (hereinafter "APCO"), to APCO's West Virginia customers. This Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel. A brief *amici curiae* has been filed by Monongahela Power Company, et al.

I

The appellants, West Virginia-Citizen Action Group, National Wildlife Federation, West Virginia Wildlife Federation and Coalition of American Electric Consumers, are non-profit corporations which, upon the record before this Court, have asserted an interest in the issue of "acid rain pollution."

The appellee, APCO, is a public utility which provides electric power service in this State. The rates and service operations of APCO are regulated by the Public Service Commission. The Public Service Commission is also an appellee in this action.

In the regular monthly billing envelopes for March, 1982 mailed to its customers, APCO inserted, along with the electric bill, a pamphlet concerning the issue of acid rain. Reflected in the pamphlet were the views of APCO in opposition to certain proposed legislation in the United States Congress regarding the control of acid rain pollution. Describing acid rain as a "perceived but unproven problem," the pamphlet stated:

This month we are using this space to ask you to write a letter, or make a telephone call, or send a wire to your

elected Federal officials: President Reagan, your U.S. Senators or your Congressman.

. . . .

Simply put, if the legislation embodied by the Mitchell or Moynihan bills becomes law, your electric bill will increase sharply, not to provide more electricity and not to ensure a reliable supply of electricity but to pay for a guessed at solution to an unproven problem. How much will this guesswork solution cost? It's difficult to say. It could amount to $1 billion a year for customers of the American Electric Power System of which Appalachian is a part. That's $1 billion a year every year for at least the rest of this century that you the customer, will have to pay.

The pamphlet concluded by stating: "Appalachian Power—March 1982 (Paid for by Shareowners of American Electric Power Company, Inc.)." [1]

In May, 1983, by letter to APCO, the appellants requested "an opportunity to enclose an insert in a future APCO billing. The insert would present the 'other side' of the acid rain controversy. Among other things, it would respond to APCO's contention that acid rain is 'a perceived but unproven problem' ...." APCO denied the appellants' request.

The appellants filed a complaint with the Public Service Commission in July, 1983. In the complaint the appellants requested that the Commission direct APCO to enclose in its billing envelopes an appropriate reply, "as determined by the Commission," to APCO's pamphlet concerning acid rain. The appellants requested, in the alternative, a hearing upon the matters raised in the complaint. In addition, the appellants requested that the Public Service Commission consider the promulgation of a rule "to govern instances in which the billing process is used for purposes of propogating one side of an issue of political controversy." APCO answered and moved to dismiss the complaint.

1. APCO is part of the American Electric Power Company, Inc. system, which system provides electricity to customers in this region of the United States.

APCO's motion to dismiss was granted by the Public Service Commission by order dated June 19, 1984.[2] The Commission determined that it had no jurisdiction to grant the relief sought by the appellants. That determination was based upon the Commission's conclusion, *inter alia*, that the appellants' assertions did not concern the "rates and services" of a public utility, over which rates and services the Commission may exercise authority.[3]

In November, 1984, we granted the appeal from the Public Service Commission's order.

## II

As indicated above, the appellants have asserted before the Public Service Commission and this Court that the APCO insert presented a "one-sided view of the acid rain issue" to APCO's customers. The appellants do not suggest that such use of the billing process by APCO be denied. However, the appellants contend that the Public Service Commission is authorized to subject APCO's billing process to a reply insert.

APCO, on the other hand, contends that the Public Service Commission was correct in determining that it had no jurisdiction to grant the relief sought by the appellants.[4] APCO asserts, in accord with the Commission's final order, that, inasmuch as the APCO insert and the appellants' complaint before the Public Service Commission did not involve the rates or services of APCO, the Commission had no authority to consider the billing insert question.[5]

The issue before this Court thus concerns whether the Public Service Commission had jurisdiction to consider the appellants' complaint and allow, by way of the billing process, a reply to the APCO insert.[6]

2. In its motion to dismiss, APCO asserted that (1) the Public Service Commission had no jurisdiction to grant the relief sought by the appellants, and (2) the complaint failed to state a claim upon which relief could be granted. As reflected in its final order dated June 19, 1984, the Public Service Commission decided the action upon jurisdictional grounds. Accordingly, the Commission never reached the question of whether the complaint stated a claim upon which relief could be granted.

3. The Public Service Commission made the following findings of fact and conclusions of law:
    1. The Public Service Commission does not have the legislative authority to be a super-management agency and oversee all actions of a public utility.
    2. The Public Service Commission does not have the requisite authority to decide constitutional questions.
    3. The Public Service Commission can regulate "practices" of public utilities as such practices affect rates and services.
    4. All "practices" of a public utility are not subject to the scrutiny of the Public Service Commission.
    5. The billing insert issue is not closely associated with rates and services.
    6. Had the ratepayers paid for the insert rather than the shareholders, a different result may have been reached as to whether this Commission has jurisdiction.
    7. The United States Supreme Court in *Consolidated Edison Company of New York, Inc.* reinforces Apco's right to enclose in its monthly bills inserts concerning controversial issues.

    8. The legislature or the courts must address this issue by granting a right to reply. [order, June 19, 1984, citations omitted]

4. In support of APCO, Monongahela Power Company, et al., *amici curiae*, assert:
    In order to achieve their aim, Appellants argue that the regulatory power of the Public Service Commission of West Virginia should extend to matters which do not have even the slightest bearing upon the adequacy of the service provided by Appalachian or the reasonableness of the rates charged for that service.
    [*amici curiae* brief at 2]

5. It should be noted that in its response to the appellants' petition for appeal, APCO states: "Appalachian does not contend that the Commission cannot require public utilities to mail rate-related or service-related information to its customers or to include various rate-related or service-related communications on its bills or in its billing envelopes."

6. In syllabus point 2 of *Monongahela Power Co. v. Public Service Commission of West Virginia,* 166 W.Va. 423, 276 S.E.2d 179 (1981), we held:
    In reviewing a Public Service Commission order, we will first determine whether the Commission's order, viewed in light of the relevant facts and of the Commission's broad regulatory duties, abused or exceeded its authority. We will examine the manner in which the Commission has employed the methods of regulation which it has itself selected, and must decide whether each of the order's essential elements is supported by substantial evidence. Finally, we will determine

For the reasons stated below, we hold that the Commission had such jurisdiction.

## III

■■■ This Court, in *Boggs v. Public Service Commission*, 154 W.Va. 146, 174 S.E.2d 331 (1970), recognized that this State's Public Service Commission "was created by the Legislature for the purpose of exercising regulatory authority over public utilities. Its function is to require such entities to perform in a manner designed to safeguard the interests of the public and the utilities. Its primary purpose is to serve the interests of the public." 154 W.Va. at 154, 174 S.E.2d at 336.

The regulatory authority of the Public Service Commission over public utilities, however, is not unlimited. As this Court stated in *Lumberport-Shinnston Gas Co. v. Public Service Commission of West Virginia*, 165 W.Va. 762, 271 S.E.2d 438 (1980): "[T]he PSC is not to be seen as a super board of directors for the public utili-

whether the order may reasonably be expected to maintain financial integrity, attract necessary capital, and fairly compensate investors for the risks they have assumed, and yet provide appropriate protection to the relevant public interests, both existing and foreseeable. The court's responsibility is not to supplant the Commission's balance of these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors.

Furthermore, we stated in *United Fuel Gas Company v. Public Service Commission*, 143 W.Va. 33, 99 S.E.2d 1 (1957):

The principle is well established by the decisions of this Court that an order of the public service commission based upon its finding of facts will not be disturbed unless such finding is contrary to the evidence, or is without evidence to support it, or is arbitrary, or results from a misapplication of legal principles. 143 W.Va. at 45, 99 S.E.2d at 8.

The above principles of review are not greatly helpful in this action. Here, the Public Service Commission granted APCO's motion to dismiss. That dismissal resulted in the jurisdictional question before this Court, i.e., whether the Commission had jurisdiction to consider the appellants' complaint and allow, by way of the APCO billing process, a reply to the APCO insert. The principal facts in this action are not in dispute.

ty companies of the State...." 165 W.Va. at 769, 271 S.E.2d at 443. Syllabus point 1 of *Eureka Pipe Line Company v. Public Service Commission of West Virginia*, 148 W.Va. 674, 137 S.E.2d 200 (1964), states: "The Public Service Commission of West Virginia has no inherent jurisdiction, power or authority and can exercise only such jurisdiction, power and authority as is authorized by statute."

The principal statutes involved in this action are *W.Va.Code*, 24–1–1 [1983], and *W.Va.Code*, 24–2–7 [1979].[7]

Indicating that the Public Service Commission was created to "exercise the legislative powers delegated" to the Commission, *W.Va.Code*, 24–1–1 [1983], in subsection (a) provides:

It is the purpose and policy of the legislature in enacting this chapter to confer upon the public service commission of this State the authority and duty to enforce and regulate the practices, services and rates of public utilities in order to:

7. *See also W.Va.Code*, 24–2–2 [1935], and *W.Va. Code*, 24–3–2 [1983].

Stating that "[t]he commission is hereby given power to investigate all rates, methods and practices of public utilities subject to the provisions of this chapter...," *W.Va.Code*, 24–2–2 [1935], further provides in part:

The commission may change any intrastate rate, charge or toll which is unjust or unreasonable or any interstate charge with respect to matters of a purely local nature which have not been regulated by or pursuant to act of Congress and may prescribe such rate, charge or toll as would be just and reasonable, and change or prohibit any practice, device or method of service in order to prevent undue discrimination or favoritism between persons and between localities and between commodities for a like and contemporaneous service. *W.Va.Code*, 24–3–2 [1983], concerning discrimination, provides in part:

It shall be unlawful for any public utility subject to the provisions of this chapter to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality, or any particular character of traffic or service, in any respect whatsoever, or to subject any particular person, firm, corporation, company or locality, or any particular character of traffic or service, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever.

(1) Ensure fair and prompt regulation of public utilities in the interest of the using and consuming public;

(2) Provide the availability of adequate, economical and reliable utility service throughout the State;

(3) Encourage the well-planned development of utility resources in a manner consistent with state needs and in ways consistent with the productive use of the State's energy resources, such as coal;

(4) Ensure that rates and charges for utility services are just, reasonable, applied without unjust discrimination or preference, applied in a manner consistent with the purposes and policies set forth in article two-A of this chapter [article two-A of chapter 24 of the West Virginia Code is entitled "Reduced Rates for Low-Income Residential Customers of Electricity and Gas"], and based primarily on the costs of providing these services; and

(5) Encourage energy conservation and the effective and efficient management of regulated utility enterprises.

With regard to the power of the Public Service Commission concerning the practices, acts or services, etc., of public utilities, *W. Va. Code*, 24–2–7 [1979], in subsection (a), provides:

Whenever, under the provisions of this chapter, the commission shall find any regulations, measurements, practices, acts or services to be unjust, unreasonable, insufficient or unjustly discriminatory, or otherwise in violation of any provisions of this chapter, or shall find that any service is inadequate, or that any service which is demanded cannot be reasonably obtained, the commission shall determine and declare, and by order fix reasonable measurements, regulations, acts, practices or services, to be furnished, imposed, observed and followed in the State in lieu of those found to be unjust, unreasonable, insufficient, or unjustly discriminatory, inadequate or otherwise in violation of this chapter, and shall make such other order respecting the same as shall be just and reasonable.

In *Consolidated Edison Company of New York, Inc. v. Public Service Commission of New York,* 447 U.S. 530, 100 S.Ct. 2326, 65 L.Ed.2d 319 (1980), Consolidated Edison, a public electric utility, challenged a regulation of the New York Public Service Commission which prohibited "utilities from using bill inserts to discuss political matters." The regulation of the New York Public Service Commission followed Consolidated Edison's insertion in certain billing envelopes mailed to Consolidated Edison's customers of written material supporting the use of nuclear power. Recognizing "that the speech of heavily regulated businesses may enjoy constitutional protection ...," 447 U.S. at 534, 100 S.Ct. at 2331, 65 L.Ed.2d at 325, the Supreme Court of the United States, in *Consolidated Edison,* held that the regulation violated the right to free speech protected by the First and Fourteenth Amendments to the Constitution of the United States. The court stated: "The Commission has limited the means by which Consolidated Edison may participate in the public debate on ... [the question of nuclear power] and other controversial issues of national interest and importance. Thus, the Commission's prohibition of discussion of controversial issues strikes at the heart of the freedom to speak." 447 U.S. at 535, 100 S.Ct. at 2332, 65 L.Ed.2d at 326.

In upholding the right of the utility to communicate by way of the billing process, the court, in *Consolidated Edison,* noted that the customers of the utility were not a "captive audience." The court stated: "The customer of Consolidated Edison may escape exposure to objectionable material simply by transferring the bill insert from envelope to wastebasket." 447 U.S. at 542, 100 S.Ct. at 2336, 65 L.Ed.2d at 331. Furthermore, the court made the following statement which is relevant to the action before this Court:

[T]he Commission has not shown on the record before us that the presence of the bill inserts at issue would preclude the inclusion of other inserts that Consolidated Edison might be ordered lawfully to include in the billing envelope. Unlike radio or television stations broadcasting

on a single frequency, multiple bill inserts will not result in a "cacophony of competing voices." [*Red Lion Broadcasting Co., Inc. v. Federal Communications Commission*, 395 U.S. 367, 376, 89 S.Ct. 1794, 1799, 23 L.Ed.2d 371, 381 (1969)]

447 U.S. at 543, 100 S.Ct. at 2336, 65 L.Ed.2d at 331–32.[8]

A public utility, in *Washington Water Power Co. v. Kottenai Environmental Alliance*, 99 Idaho 875, 591 P.2d 122, (1979), placed an insert (paid for by shareholders) in the billing envelopes it mailed in March and May, 1975 to its customers. The insert expressed the view of the utility that certain hydro-electric facilities should be constructed upon the Middle Snake River. In response, the Idaho Public Utilities Commission ordered the utility to "refrain from including political advocacy with any bill for services or commodities furnished to any of its Idaho customers."

The Public Utilities Commission in *Washington Water Power* had the statutory authority to investigate and establish the "rates, fares, tolls, rentals, charges, classifications, rules, regulations, practices or contracts" of public utilities. The Supreme Court of Idaho determined that, under such authority, the Public Utilities Commission could not regulate the political statements of utilities. Thus, the court held that the Commission had no jurisdiction to issue the order concerning the billing inserts. The court stated:

> The subject matter of the Commission's order at issue here does not deal with the subject matter traditionally regulated by public utility commissions and does not fall into a category of regulation which requires the technical expertise of a commission as contrasted with a legislature. The determination of whether the customers of ... [Washington Water Power Co.] need to be protected from 'political advocacy' is equally, if not more, within the expertise of the Idaho Legislature as contrasted with the Commission.
>
> . . . .
>
> In sum, we do not accept the argument of the Commission that their authority in the present circumstances should be so broadly construed as beyond the traditional and orthodox ratemaking function.

99 Idaho at 882, 591 P.2d at 129.

On the other hand, in *Brooklyn Union Gas Company v. Public Service Commission*, 101 A.D.2d 453, 478 N.Y.S.2d 78 (1984), the Public Service Commission of the State of New York ruled that if a utility providing gas service to its customers "relied in any of its promotional advertisements on the price advantage of natural gas, it had to include a disclaimer that any such advantage might dissipate as a result

---

**8.** The New York Public Service Commission, in *Consolidated Edison,* in support of its regulation prohibiting "utilities from using bill inserts to discuss political matters," cited *Red Lion, supra,* for the proposition that in certain circumstances the exercise of governmental authority over speech is justified.

The Supreme Court of the United States recognized in *Red Lion* that radio and television broadcast frequencies constitute "a scarce resource whose use could be regulated and rationalized only by the Government." 395 U.S. at 376, 89 S.Ct. at 1799, 23 L.Ed.2d at 381. As the court noted in *Red Lion,* without government control, broadcast frequencies would display a "cacophony of competing voices, none of which could be clearly and predictably heard." *Id.*

Thus, the New York Public Service Commission, in *Consolidated Edison,* asserted that "because a billing envelope can accommodate only a limited amount of information, political messages should not be allowed to take the place of inserts that promote energy conservation or

safety, or that remind consumers of their legal rights." 447 U.S. at 542, 100 S.Ct. at 2336, 65 L.Ed.2d at 331.

However, the Court in *Consolidated Edison* observed:

> [B]illing envelopes differ from broadcast frequencies in two ways. First, a broadcaster communicates through use of a scarce, publicly owned resource. No person can broadcast without a license, whereas all persons are free to send correspondence to private homes through the mails. Thus, it cannot be said that billing envelopes are a limited resource comparable to the broadcast spectrum. Second, the Commission has not shown on the record before us that the presence of the bill inserts at issue would preclude the inclusion of other inserts that Consolidated Edison might be ordered lawfully to include in the billing envelope.

447 U.S. at 542–43, 100 S.Ct. at 2336, 65 L.Ed.2d at 331.

of deregulation." 101 A.D.2d at 455, 478 N.Y.S.2d at 81. That ruling was affirmed by the Appellate Division of the Supreme Court of the State of New York. Relying upon a provision of N.Y. Public Service Law § 66, subd. 12–a. (McKinney 1983),[9] which provided that "[t]he commission shall further ensure periodic explanation of applicable rates and rate schedules for the purpose of assisting customers in making the most efficient use of energy," the court, in *Brooklyn Union Gas Company,* stated:

> The PSC has a genuine concern that advertisements of the cost advantages of natural gas should disclose to customers that deregulation may result in an increase in natural gas prices which could dissipate any price advantage. Such information may be vital to a customer who is considering the expense of converting to natural gas. Thus, we conclude that the PSC had the statutory authority to require the disclaimer.
>
> ....
>
> The State of New York clearly has a substantial interest in requiring a utility, which is by statute heavily regulated, to provide complete information to consumers if it chooses to advertise the price advantages of its service.
>
> ....
>
> Here, the PSC did not restrict or limit petitioner's right to expression, but required it to add a specific disclaimer if it engaged in a certain form of advertising. This disclaimer is specific and is drawn to remedy the situation the PSC sought to correct. Such a disclaimer is not improper ... [citations omitted].

101 A.D.2d at 458, 459–60, 478 N.Y.S.2d at 82, 83.

**9.** N.Y. Public Service Law § 66, subd. 12–a. (McKinney 1983), provides in full that the "commission shall":

> Have power to fix and alter the format and informational requirements of bills utilized by public and private gas corporations, electric corporations and gas and electric corporations in levying charges for service, to assure simplicity and clarity and to require indication of any adjustment charges, including but not limited to fuel adjustments, in monetary amounts. The commission shall further en-

In spite of the distinction in applicable statutes between New York and West Virginia, the *Brooklyn Union Gas Company* case is particularly relevant to the action before this Court. In *Brooklyn Union Gas Company,* the Public Service Commission acted in the public interest to ensure that the utility's customers would know that the price of gas service could vary, depending upon the effect of industry deregulation. In this action, APCO's customers were told, by way of the billing insert, that, if certain legislation is enacted into law, electric bills "*will* increase sharply" by, possibly, billions of dollars. (emphasis added). A reading of the APCO insert reveals that although the question of acid rain pollution was discussed in the insert, the insert was primarily concerned with the proposed legislation before the United States Congress and the impact of that legislation upon the cost APCO's customers must bear for electric services. N.Y. Public Service Law § 66, subd. 12–a. (McKinney 1983), notwithstanding, West Virginia, as well as New York, "has a substantial interest in requiring a utility, which is by statute heavily regulated, to provide complete information to consumers...." *Brooklyn Union Gas Company, supra.*[10]

Under the facts of this action, we decline to follow the result reached by the Idaho court in *Washington Water Power Co.* Although this State does not have the specific statutory language noted in *Brooklyn Union Gas Company,* that the Public Service Commission "shall further ensure periodic explanation of applicable rates and rate schedules for the purpose of assisting customers in making the most efficient use of energy," it seems to this Court fundamental that the Public Service Commission of West Virginia would have the authority in

> sure periodic explanation of applicable rates and rate schedules for the purpose of assisting customers in making the most efficient use of energy.

**10.** The parties in this action are in agreement that the Public Service Commission of West Virginia has required certain public utilities to annually inform customers that certain general rate information is available from the public utility upon request.

the context of this action to ensure that complete information is available to customers regarding the costs of utility services. *See* n. 10, *supra.*

We thus conclude that the Public Service Commission of West Virginia has jurisdiction under its authority to safeguard the interests of the public, and regulate, under *W.Va.Code*, 24–1–1 [1983], the "practices, services and rates of public utilities," to establish methods by which APCO's customers may, with regard to the APCO insert, receive contrasting or opposing viewpoints concerning the costs they must bear for electric services.[11]

In the area of broadcasting, this Court, in *United Mine Workers of America International Union v. Parsons,* 172 W.Va. 386, 305 S.E.2d 343 (1983), discussed the "reasonable opportunity for the presentation of contrasting points of view." In *Parsons,* the "political and controversial" views of certain coal production associations concerning this State's "business climate" were expressed during West Virginia University's radio broadcasts in 1982 of football games. In an original mandamus proceeding filed in this Court, the United Mine Workers of America International

Union sought to compel the respondents, the University [a state-supported institution] and the West Virginia Board of Regents, to provide the union with an opportunity to express contrasting views.

Finding that the respondents had a "constitutional obligation to present opposing viewpoints" to the expressions in question, this Court, in *Parsons,* held that the union had a right to respond to the associations "in the event that political advertising by the coal associations again appears ..." during the University's broadcasts. 172 W.Va. at 389–390, 305 S.E.2d at 346, 360. Furthermore, we ordered that the respondents promulgate standards to be used in the future for "evaluating requests for response time." 172 W.Va. at 404, 305 S.E.2d at 360.

In recognizing the right to respond to certain broadcast communications, we discussed, in *Parsons,* "the 'public forum doctrine' which protects the right of citizens to use certain governmental property for the exercise of free speech, and the 'fairness doctrine' which requires that the discussion of public issues be presented on broadcast stations, and that each side of those issues be given fair coverage." 172 W.Va. at 393, 305 S.E.2d at 349.[12] The spirit of those

11. In paragraph 18 of the complaint filed before the Public Service Commission, the appellants stated:

Since the date of the distribution of the Defendant Corporation's "acid rain" billing insert, the Edison Electric Institute, an arm of the electric utility industry, released the results of a survey of twenty-four (24) eastern utilities regarding the impact of acid rain control legislation. In an article appearing in *The Charleston Gazette* on Wednesday, June 29, 1983, the survey is quoted as revealing that the American Electric Power System estimated that customers of its affiliate, Appalachian Power Company (Defendant Corporation herein), would experience *no increase* in their electric bills as a result of acid rain control. * * * This information, of course, is converse to that presented by the Defendant Corporation in its acid rain billing insert and serves to underscore the need for a responsible reply.

12. The "public forum doctrine" was discussed by the United States Supreme Court in *Police Department of the City of Chicago v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972), and the "fairness doctrine" was discussed by that court in *Red Lion Broadcasting Co., Inc. v.*

*Federal Communications Commission,* 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

The United States Supreme Court in *Mosley* had before it a municipal ordinance prohibiting picketing near schools, except "the peaceful picketing of any school involved in a labor dispute." That ordinance was held by the Supreme Court to be invalid because the ordinance made a constitutionally impermissible distinction between labor picketing and other peaceful picketing. The court stated:

Necessarily, then, under the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views. And it may not select which issues are worth discussing or debating in public facilities. There is an 'equality of status in the field of ideas,' and government must afford all points of view an equal opportunity to be heard. Once a forum is opened up to assembly or speaking by some groups, government may not prohibit others from assembling or speaking on the basis of what they intend to say. Selective exclusions from a public forum may not be based on content alone, and

doctrines is reflected in syllabus point 1 of *Parsons:*

> When a state agency or instrumentality sells advertising for broadcast which presents one side of a politically controversial issue of public concern, it is obligated under W.Va. Const. art. III, § 3 and art. III, § 7, to preserve its neutrality by providing a reasonable opportunity for the presentation of contrasting points of view in order that the 'common benefit, protection and security' be served and fundamental fairness preserved.[13]

The *Parsons* case, recognizing the benefits to the public of presenting contrasting or opposing viewpoints, is supportive of our holding in this action. However, this action does not encompass the broad constitutional doctrines, such as the "public forum doctrine" and the "fairness doctrine," discussed in the *Parsons* opinion. *See* n. 12, *supra.* In this action, we do not suggest that the Public Service Commission has jurisdiction to involve itself with differing viewpoints upon various political issues. Chapter 24 of the West Virginia Code confers no such authority upon the Commission. Rather, we are concerned here with the customers of utilities and the Commission's authority with respect to the information those customers receive, by way of the billing process, regarding costs (including projected costs) of utility services.

■ Accordingly, we hold that where a public utility communicates, through its billing process, with its customers upon matters concerning the costs customers must bear if certain legislation concerning utilities is enacted into law, the Public Service Commission of West Virginia has jurisdiction under its authority to (1) safeguard the interests of the public, and (2) regulate the "practices, services and rates of public utilities," to establish methods by which the utility's customers may receive contrasting or opposing viewpoints concerning such costs. *W.Va.Code,* 24–1–1 [1983]. In particular, we hold that where a public utility placed in its monthly billing envelopes mailed to its customers an insert which stated that electric bills will "increase sharply" if certain legislation before the United States Congress, concerning utilities, is enacted into law, the Public Service Commission of West Virginia had jurisdiction to require that a subsequent mailing of the utility's billing envelopes contain the insert of an appropriate spokesman, setting forth contrasting or opposing viewpoints to the utility's insert.

■ With regard to an "appropriate spokesman," we note our holding in syllabus point 2 of *Parsons* that "[a]lthough it is normally within a state agency's discretion to determine the appropriate spokesman for the presentation of opposing viewpoints, it must, under the standards of reasonableness and good faith, consider legit-

may not be justified by reference to content alone. 408 U.S. at 96, 92 S.Ct. at 2290, 33 L.Ed.2d at 217.

The United States Supreme Court in *Red Lion* held that the United States Congress and the Federal Communications Commission did not violate the First Amendment to the Constitution of the United States by requiring "a radio or television station to give reply time to answer personal attacks and political editorials." 395 U.S. at 396, 89 S.Ct. at 1810, 23 L.Ed.2d at 393. In so holding, the court observed: "The Federal Communications Commission has for many years imposed on radio and television broadcasters the requirement that discussion of public issues be presented on broadcast stations, and that each side of those issues must be given fair coverage. This is known as the fairness doctrine...." 395 U.S. at 369, 89 S.Ct. at 1796, 23 L.Ed.2d at 377.

**13.** *W.Va. Const.,* art. III, § 3, provides:

Government is instituted for the common benefit, protection and security of the people, nation or community. Of all its various forms that is the best, which is capable of producing the greatest degree of happiness and safety, and is most effactually secured against the danger of maladministration; and when any government shall be found inadequate or contrary to these purposes, a majority of the community has an indubitable, inalienable, and indefeasible right to reform, alter or abolish it in such manner as shall be judged most conducive to the public weal. *W.Va. Const.,* art. III, § 7, provides:

No law abridging the freedom of speech, or of the press, shall be passed; but the legislature may by suitable penalties, restrain the publication or sale of obscene books, papers, or pictures, and provide for the punishment of libel, and defamation of character, and for the recovery, in civil actions, by the aggrieved party, of suitable damages for such libel, or defamation.

imate requests by those wishing to express opposing views."

Finally, we do not in this action address the issue of whether the shareholders or the ratepayers paid for the APCO insert of March, 1982. The APCO insert asserted that the nature of its customers' future electric bills was directly related to the success or failure of the proposed legislation. We do not perceive as critical a determination of whether APCO's shareholders or ratepayers paid for that insert. Rather, as indicated above, we are concerned with the Commission's authority with respect to the information those customers receive, by way of the billing process, regarding the costs of utility services.

Upon all of the above, the final order of the Public Service Commission of West Virginia is hereby reversed, and this action is remanded to the Commission for further proceedings consistent with this opinion.

Reversed and remanded.