IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2025 Term

_____

No. 24-696

_____

FILED

May 22, 2025

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

GAULEY RIVER PUBLIC
SERVICE DISTRICT,
Petitioner,

v.

PUBLIC SERVICE COMMISSION
OF WEST VIRGINIA,
Respondent.

_____

Appeal from the Public Service Commission
of West Virginia
No. 22-0456-PWD-DU

AFFIRMED

_____

Submitted: March 18, 2025
Filed: May 22, 2025

James V. Kelsh, Esq.
Peter G. Markham, Esq.
Natalie E. Thomas, Esq.
Bowles Rice LLP
Charleston, West Virginia
Counsel for Petitioner

Jessica L. Carter, Esq.
Jessica M. Lane, Esq.
Public Service Commission
of West Virginia
Charleston, West Virginia
Counsel for Respondent

JUSTICE TRUMP delivered the Opinion of the Court.

# SYLLABUS BY THE COURT

1. "The detailed standard for our review of an order of the Public Service Commission contained in Syllabus Point 2 of *Monongahela Power Co. v. Public Service Commission,* 166 W.Va. 423, 276 S.E.2d 179 (1981), may be summarized as follows: (1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order is proper." Syllabus Point 1, *Central West Virginia Refuse, Incorporated v. Public Service Commission of West Virginia*, 190 W. Va. 416, 438 S.E.2d 596 (1993).

2. "'Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review.' Syllabus Point 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995)." Syllabus Point 1, *Pool v. Greater Harrison County Public Service District*, 241 W. Va. 233, 821 S.E.2d 14 (2018).

3. "'The Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to the regulation of public utilities. It has no inherent power or authority.' Syl. pt. 2, *Wilhite v. Public Service Commission,* 150

i

W.Va. 747, 149 S.E.2d 273 (1966)." Syl. Pt. 2, *Casey v. Public Service Commission,* 193 W.Va. 606, 457 S.E.2d 543 (1995).

4.    "'A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syllabus Point 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951)." Syllabus Point 3, *Mason County Public Service District v. Public Service Commission of West Virginia*, 247 W. Va. 580, 885 S.E.2d 161 (2022).

**TRUMP, Justice**:

A general investigation by the Public Service Commission of West Virginia ("Commission") into interruptions in water service to the Mount Olive Correctional Complex ("Mt. Olive") over a consecutive three-month period led the Commission to conduct proceedings into whether the prison's water service provider, Gauley River Public Service District ("Gauley River"), is a distressed or failing utility within the meaning of the Distressed and Failing Utilities Improvement Act, West Virginia Code §§ 24-2H-1 through -9 (2020). The Commission determined Gauley River to be a distressed utility and ordered that it negotiate an operation and maintenance agreement with West Virginia-American Water Company ("WVAWC") providing for oversight and managerial control over the operation, maintenance, and administrative functions of Gauley River by WVAWC. Gauley River filed with the Commission an agreement it negotiated with WVAWC; however, upon determining that the agreement failed to comport with the Commission's specific directives, the Commission rejected it and ordered Gauley River and WVAWC to execute a standard operation and maintenance agreement structured by the Commission. On appeal, Gauley River argues that the Commission exceeded its statutory authority, both procedurally and substantively, by ordering Gauley River and WVAWC to enter into this agreement.

Upon our review, we find no error and affirm the Commission's order.

1

Gauley River is a sale-for-resale water system that purchases water for its customers from the Kanawha Falls Public Service District ("Kanawha Falls") and the Summersville Municipal Water System ("Summersville"). Gauley River provides water service to Mt. Olive, a maximum-security state prison located in Fayette County, West Virginia, that houses approximately one thousand prisoners. Mt. Olive is, by far, Gauley River's largest customer. Gauley River purchases water for Mt. Olive exclusively from Kanawha Falls.

On February 14, 2022, Commission Staff (sometimes referred to as "Staff") filed a petition requesting that the Commission open a general investigation into interruptions in water service to Mt. Olive between December 2021 and February 2022.[1] By Commission Order entered that same day, the Commission granted the petition and opened an investigation, naming Gauley River, Kanawha Falls,[2] Summersville, and WVAWC as respondents.

Commission Staff subsequently determined that water service to Mt. Olive had been restored on February 18, 2022, and appeared to be sustained. Subsequently, during the period March 1, 2022, to March 10, 2023, Gauley River issued four boil water

---

[1] Specifically, water service to Mt. Olive was lost several times, with some outages lasting several days. Prior to the prolonged outage, the facility experienced instances of water service interruptions, curtailment requests, and boil-water advisories.

[2] A similar investigation was separately initiated against Kanawha Falls.

advisories due to leaks or other problems in its system, and two additional boil water advisories because Kanawha Falls had issued advisories as to the water delivered to Gauley River's systems. The advisories each lasted two days.

The investigation led Commission Staff to file a petition with the Commission on May 16, 2022, to establish a proceeding to determine whether Gauley River should be classified as a distressed or failing utility ("distressed utility proceeding").[3] The investigation caused Staff to become concerned by several issues related to the operation and maintenance of Gauley River that, if not properly remedied, could "lead to further loss-of-service events." According to the petition, Staff was also concerned that "any prolonged loss of water service to [Mt. Olive] . . . must be considered as a <u>threat to the safety of the general public</u> owing to the nature of this high-security prison and its volatile mix of inmates." It was Staff's position that Gauley River should be classified as a distressed utility pursuant to West Virginia Code § 24-2H-6(a), asserting that Gauley River "lacks technical, and managerial ability to operate the utility on an ongoing basis[.]" As explained in the petition, Gauley River

> has operated for many years without adequate and efficient operational management, relying on the governing Board. Volunteer PSD Board members do not have the time or possess the experience and specialized skills needed to effectively act in the role of general manager – nor were they intended to

---

[3] *See* W. Va. Code § 24-2H-6(a) ("A proceeding under this article may be initiated by the commission on its own motion, or by the staff of the commission, or any other person having a legal interest in the financial, managerial, or operational condition of the utility, by filing a petition with the commission that includes all of the factual data supporting the justification for the utility to be considered as a distressed or failing utility that the petitioner has available to them at the time of the filing[.]").

assume such role. This has resulted in a prolonged lack of effective general management which is evident when one looks at the absence of strategic (long-term) planning, the lack of short-term planning (capital spending plans), the absence of a staffing plan, the lack of any effective plan for monitoring and enhancing system performance (water loss reduction programs, line replacement plans, capital equipment replacement plans, etc.) and the lack of emergency or contingency planning.

[Gauley River] operates with a bare minimum of staff and without appropriate operational management. Although existing staff are able to maintain day-to-day operations of the utility under most conditions they are not able to fill the gap left by the long-term lack of a general manager. This absence of management skills leaves the utility subject to events which could easily be prevented. This has been made evident by the recent loss-of-service event which could have been mitigated or prevented, through an industry-standard "hazards and operations" analysis – which would have been completed by any competent general manager.

The Commission stayed its ruling on the petition pending review of Commission Staff's final recommendation following its general investigation.

Commission Staff filed its Final Joint Staff Memorandum on August 15, 2022, recommending that the Commission establish distressed utility proceedings as to both Gauley River and Kanawha Falls. Commission Staff reported that the loss of service to Mt. Olive was due to "the demand for water exceed[ing] the available supply over a period of days-to-weeks. The failure of [Gauley River and Kanawha Falls] to maintain service to [Mt. Olive] was due to a combination of factors some of which extend back decades." The Commission's Engineering Staff identified various problems with both utilities "impacting the adequacy of water supply to Mt. Olive including the condition of both systems" as well as "managerial and operation deficiencies, a lack of capacity . . .,

4

and failure to comply with the Commission's <u>Rules for the Government of Water Utilities</u>[.]" Staff found that factors contributing to the outage included "Distribution System Issues, Telemetry, Inter-utility Communications, Supply Inadequacy, and Management Issues," all of which were addressed in detail in the Final Joint Staff Memorandum.

On September 1, 2022, Gauley River filed a response to the Final Joint Staff Memorandum denying that any negligent action or inaction by its management or employees caused the interruption of water service to Mt. Olive. Gauley River further denied that it "has suffered from a lack of proper management or oversight for decades" as alleged by Staff and maintained that it does not meet the definition of a distressed utility because there has been no further interruption in service to Mt. Olive or to a significant portion of its customers.

By order entered September 29, 2022, the Commission granted Staff's petition and opened a distressed utility proceeding.[4] WVAWC was identified as a potential "capable proximate utility."[5]

---

[4] The Commission opened a separate distressed utility proceeding as to Kanawha Falls.

[5] *See* W. Va. Code § 24-2H-3(c) (defining "capable proximate water or wastewater utility" as "a public utility which regularly provides adequate, safe, and reasonable service of the same type as the distressed utility and is situated close enough to the facilities of a distressed utility that operational management is reasonable, financially viable, and nonadverse to the interests of the current customers of the nondistressed utility.").

On May 31, 2023, prior to the scheduled hearing in the distressed utility proceeding, the parties (Gauley River, Commission Staff, WVAWC, Kanawha Falls, and Summersville) entered into a Joint Stipulation and Agreement for Settlement ("Joint Stipulation"), which they submitted to the Commission for its approval in an effort to resolve all issues. Among other things, the parties requested that the Commission's final order "make no determination as to whether Gauley River is a distressed or failing utility," that the Commission approve the Plan of Corrections that they submitted contemporaneously with the Joint Stipulation, and direct Gauley River to implement the same. The Plan of Corrections required Gauley River to prepare a comprehensive Corrective Action Plan (CAP) to be filed with the Commission within six months of entry of the Commission's final order and which would address, at a minimum, the following key items: (1) water loss control, (2) long term planning, (3) asset management, (4) staffing, (5) projects, (6) operations, (7) service to Mt. Olive, (8) regulatory issues, and (9) financing for improvements.

An evidentiary hearing was conducted on June 1, 2023, at which hearing the Commission considered the Joint Stipulation and questioned witnesses appearing on behalf of Commission Staff, WVAWC, and Gauley River. It also reviewed pre-filed testimony.

In an order entered on August 25, 2023, the Commission expressed concern that it "d[id] not have the CAP to review" and that Gauley River "will not have the technical or institutional knowledge and ability to (1) prepare the CAP, and (2) implement the CAP without engaging numerous outside consultants at high costs." These latter concerns were confirmed by the testimony of Ralph Arthur, the chairman of the Gauley River board. In

6

the order, the Commission also acknowledged that Staff witness Jonathan Fowler of the Commission's Engineering Division recommended that the Commission adopt the Joint Stipulation and the CAP. However, the Commission noted Mr. Fowler's opinion that Gauley River's ability to implement the CAP will depend on whether it "acquire[s] the necessary funding to develop, implement, and maintain each of the itemized plans contained in the CAP," that "all of the corrective actions in the Joint Stipulation are actions Gauley River should have done historically," and that "Gauley River has historic levels of understaffing which led to the issues that sparked the Underlying Investigation and this proceeding." Mr. Fowler testified that it was his opinion that Gauley River is a distressed utility.

The Commission further relied on the testimony of witness Brooks Crislip, WVAWC's Director of Business Development, who indicated that although WVAWC "does not have issues with the Joint Stipulation," WVAWC would have concerns about the viability of Kanawha Falls continuing as the primary supplier of water to Gauley River. According to Mr. Crislip, partnering WVAWC with Gauley River "would probably be a long-term solution . . . [i]f they can be a partner and have that level of communication and provide some operational and maintenance expertise, they might be able to make this reliable."

Ultimately, the Commission noted its concern "regarding Gauley River's ability to develop and implement the CAP" as set forth in the parties' Joint Stipulation because Gauley River "had a duty to perform the items in the CAP" even before entering into the Joint Stipulation, but had failed to do so. Based upon the evidence presented, the

7

Commission modified the Joint Stipulation by finding Gauley River to be a distressed utility.[6]

The Commission further modified the Joint Stipulation by directing "Gauley River and WVAWC to negotiate a mutually agreed arms-length O & M [i.e., operation and maintenance][7] Agreement," pursuant to its authority under West Virginia Code § 24-2H-7(b)(2).[8] The Commission found:

> The staffing and expertise of WVAWC places it in the best position to provide needed management and oversight of the operations of Gauley River. In addition, WVAWC can assist Gauley River in preparing and implementing a comprehensive corrective action plan (CAP), which should be included in the O & M Agreement.
>
> The Commission is aware that Gauley River and Summersville have an existing water purchase agreement. Furthermore, Gauley River's Summersville Flow Enhancement Project . . . will go to bid in the Fall of 2023, and will increase the amount of water Summersville can supply to Gauley River. WVAWC and Gauley River should cooperate with Summersville to install an upgraded connection for backup for Kanawha Falls because Kanawha Falls operates at full capacity.

---

[6] *See* W. Va. Code § 24-2H-3(a) (defining "distressed utility") and W. Va. Code § 24-2H-5(a) (setting forth factors to be considered in determining whether a utility is "distressed" or "failing").

[7] In this order, the Commission identified the agreement as an "operations and management agreement" rather than an "operation and maintenance agreement" as it did throughout its other orders entered in this case. We believe the discrepancy to be merely a clerical error.

[8] Pursuant to West Virginia Code § 24-2H-7(b)(2), the Commission may order the "[o]peration of the distressed utility by another public utility or management or service company under a mutually agreed arms-length contract[.]" *See* discussion *infra.*

8

The O & M Agreement must clearly provide for WVAWC to have oversight and managerial control over operation, maintenance and administrative functions of Gauley River. This level of control must authorize [WVAWC] to address and implement remedial actions to correct the financial, operational, managerial, and staffing issues identified by Staff in this proceeding. WVAWC should assist Gauley River with applying for funding to finance the recommended capital improvements.

The Commission ordered that a proposed operation and maintenance agreement be filed with the Commission within thirty days and provided specific directions as to how the parties should proceed if their negotiations were unsuccessful.[9]

On November 17, 2023, Gauley River and WVAWC filed with the Commission their proposed operation and maintenance agreement ("proposed agreement") providing that WVAWC "would provide management and oversight to [Gauley River], including assistance with the preparation and implementation of a [CAP]" and for Gauley River and WVAWC to cooperate with Summersville on the Summersville interconnection project. Under the proposed agreement, Gauley River would provide WVAWC access to

---

[9] Specifically, the order directed that if the parties were unable to successfully negotiate an agreement, then WVAWC must, within thirty days of entry of the August 25, 2023, order,

make a filing . . . that provides the terms that have been agreed upon, the terms that [WVAWC] proposed but which were not agreed to, and testimony in support of [WVAWC's] proposed terms that are not agreed to. [Gauley River] and any other party shall respond within ten days of such a filing. [Gauley River's] response must include testimony explaining why it disagrees with the proposed term(s) and redline alternative language which it would agree to.

9

its equipment records and data and grant WVAWC right of entry to its water storage and distribution system and related water utility assets (collectively "the System"). However, Gauley River would, among other things, continue to operate and maintain the System day-to-day, continue to read meters, bill, and collect from its customers "as it has in the past," continue to be "responsible for the cost of all materials, supplies and capital repairs to its system unless [WVAWC] agrees in writing to pay such expenses," "maintain its current and planned staffing at levels consistent with the continued operation of the System," retain a wide array of authority and responsibility in its Board, continue to be responsible for routine operation and repairs of the System, and retain the right to pursue implementation of the Summersville interconnection project. Gauley River agreed to pay WVAWC a flat monthly fee of $2,000. The thirty-six-month term of the proposed agreement would begin upon the Commission's approval of the proposed agreement.

By order entered March 15, 2024, the Commission rejected the proposed agreement, finding that it failed to meet the requirements set forth by the Commission in its August 25, 2023, order. The Commission found that the proposed agreement "contained terms outlining a vague consulting agreement between Gauley River and WVAWC for a term of 36 months" and "[r]ather than WVAWC operating and managing Gauley River's water service, the proposed [a]greement merely calls for WVAWC to make recommendations that Gauley River may accept or reject. The proposed [a]greement leaves Gauley River entirely in control and responsible for the ongoing operations and maintenance of the water system[,]" which the Commission found to be contrary to its August 25, 2023, order. The Commission ordered the parties to file an operation and

10

maintenance agreement that comports with the August 25, 2023, order no later than March 22, 2024. The order further directed the parties as to how to proceed if they were unable to fully agree upon an operation and maintenance agreement to submit to the Commission for its approval.[10]

On March 22, 2024, counsel for WVAWC submitted a letter to the Commission stating only that counsel for Gauley River and WVAWC "have discussed ways to address the Commission's directives but have not settled on a suitable approach."

On March 25, 2023, Gauley River filed a petition for reconsideration of the Commission's March 15, 2024, order generally arguing that entering into an operation and maintenance agreement as required by the Commission's order could delay or jeopardize the construction of the Summersville Flow Enhancement Project and suggesting that such an agreement could put the utility at risk of losing outside funding for that project. Gauley

---

[10] Similar to its August 25, 2023, order, the March 15, 2024, order specifically directed that

> [i]f WVAWC and Gauley River are unsuccessful in their negotiations, WVAWC must make a filing no later than April 12, 2024 that provides the terms that have been agreed upon, the terms that WVAWC proposed but which were not agreed to, and include either an affidavit or testimony in support of WVAWC's proposed terms that are not agreed upon. Gauley River and any other party shall respond within ten day of such filing. Gauley River's response must include testimony explaining why it disagrees with the proposed term(s), along with alternative language for those terms, tracked in its proposed agreement. If such competing proposals are filed, the Commission will formulate specific language for those areas still in disagreement and require that the formulated language be incorporated into the Parties' agreement.

River requested that the Commission rescind the March 15th order and approve either the previously filed Joint Stipulation (without modification) or the proposed agreement that the parties submitted on November 17, 2023 (and that the Commission rejected in its March 15, 2024, order).

By order entered October 31, 2024, the Commission denied Gauley River's petition for reconsideration[11] and ordered the parties to enter into a standard operation and maintenance agreement structured by the Commission ("the ordered agreement") and to file a signed copy thereof with the Commission within twenty days. It is from the Commission's October 31, 2024, order that Gauley River now appeals.[12]

## II. Standard of Review

We review an order of the Public Service Commission of West Virginia under the following standard: "(1) whether the Commission exceeded its statutory jurisdiction and powers; (2) whether there is adequate evidence to support the Commission's findings; and, (3) whether the substantive result of the Commission's order

---

[11] The Commission found that the petition "failed to provide evidence that entering into a standard operation and maintenance agreement would cause it to lose current grant funding or prevent it from applying for future grant money."

[12] An order correcting certain typographical errors in the October 31, 2024, order and ordered agreement, along with the corrected ordered agreement, were filed on November 4, 2024. For clarity, this opinion will refer to the October 31, 2024, order as the order on appeal.

12

is proper." Syl. Pt. 1, *Cent. W. Va. Refuse, Inc. v. Pub. Serv. Comm'n of W. Va.*, 190 W. Va. 416, 438 S.E.2d 596 (1993).

Because we are being asked to consider whether the Commission exceeded its statutory authority, we examine the issues before us *de novo*: "'Interpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review.' Syl. Pt. 1, *Appalachian Power Co. v. State Tax Dep't of W. Va.*, 195 W. Va. 573, 466 S.E.2d 424 (1995)." Syl. Pt. 1, *Pool v. Greater Harrison Cnty. Pub. Serv. Dist.*, 241 W. Va. 233, 821 S.E.2d 14 (2018).

### III.   Discussion

In 2020, the Legislature enacted the Distressed and Failing Utilities Improvement Act ("the Act"), making legislative findings concerning, among other things, the positive impact of safe drinking water on public health, needed capital investment in aging infrastructure by water utilities having limited financial resources, and the negative effects that neglecting such infrastructure has had on the ability to serve customers and maintain regulatory compliance. W. Va. Code § 24-2H-2(a), (c), and (f).

Under the Act, upon finding that a utility is a distressed utility (rather than a failing utility[13]) and identifying a capable proximate utility,[14] the Commission is authorized

---

[13] *See* W. Va. Code § 24-2H-3(b) (defining "failing water or wastewater utility").

[14] *See supra* n.5.

13

to "make an order consistent with" West Virginia Code § 24-2H-7(b)[15] to ensure that the challenges confronting water and wastewater utilities are adequately addressed. The statute provides:

> Before the commission may designate a water or wastewater utility as failing and order acquisition by a capable proximate utility it shall determine whether there are any alternatives to an ordered acquisition. *If the commission determines that an alternative to designating a utility as failing and ordering an acquisition is reasonable and cost effective, it may order the distressed utility and, if applicable to the alternative a capable proximate utility, to implement the alternative.* Commission staff shall work with the utility to implement the alternative, as necessary. Alternatives that the commission may consider include, but are not limited to, the following:
>
> (1) Reorganization of the utility under new management or a new board, subject to the approval of the applicable county commission(s) or municipal government;
>
> (2) Operation of the distressed utility by another public utility or management or service company under a mutually agreed arms-length contract;

---

[15] As provided in West Virginia Code § 24-2H-7(a),

> [f]ollowing the evidentiary hearing, the commission shall enter a final order stating whether the utility is a distressed or failing utility and identifying the capable proximate utilities, if any, as defined in § 24-2H-3 of this code. *If the commission determines that a utility is a distressed utility, then the commission may make an order consistent with subsection (b) of this section.* If the commission determines that the utility is a failing utility, then the commission may order the acquisition of the failing utility by the most suitable capable proximate water or wastewater utility, if there is more than one.

(Emphasis added).

14

(3) Appointment of a receiver to assure the provision of adequate, efficient, safe and reasonable service and facilities to the public pursuant to § 24-2-7(b) of this code;

(4) Merger of the water or wastewater utility with one or more other public utilities, subject to the approval of the applicable county commission(s) or municipal government;

(5) The acquisition of the distressed utility through a mutual agreement made at arms-length; and

(6) Any viable alternative other than an ordered acquisition by a capable proximate utility.

(Emphasis added).

As discussed above, the Commission designated Gauley River as a distressed utility[16] (rather than a failing utility) and ordered that it and WVAWC (a capable proximate utility) implement "an alternative to . . . an acquisition"—specifically, the operation of Gauley River by WVAWC under a mutually agreed arms-length contract, pursuant to West Virginia Code § 24-2H-7(b)(2). The Commission directed that the agreement between Gauley River and WVAWC

> must clearly provide for WVAWC to have oversight and managerial control over operation, maintenance and administrative functions of Gauley River. This level of control must authorize [WVAWC] to address and implement remedial actions to correct the financial, operational, managerial, and

---

[16] On appeal, Gauley River does not assign as error the Commission's designation of the utility as a distressed utility. However, in its brief, Gauley River states that the ordered agreement "is not supported by the evidence because the facts show that Gauley River is not a distressed or failing utility." In response to questioning by this Court during oral argument, counsel for Gauley River clarified that the propriety of the Commission's designation of Gauley River as a distressed utility is not being challenged in this appeal. Accordingly, we do not address whether the Commission erred in designating Gauley River as a distressed utility.

15

staffing issues identified by Staff in this proceeding. WVAWC
should assist Gauley River with applying for funding to finance
the recommended capital improvements.

However, Gauley River and WVAWC failed to successfully negotiate such an agreement; instead, they submitted an agreement the Commission found to be "a vague consulting agreement . . . for a term of 36 months" "call[ing] for WVAWC to make recommendations that Gauley River may accept or reject" and "leav[ing] Gauley River entirely in control and responsible for the ongoing operations and maintenance of the water system." The Commission rejected the proposed agreement as being counter to the Commission's directives, and again ordered that Gauley River and WVAWC submit an operation and maintenance agreement containing the terms the Commission outlined in its previous order. The Commission further directed the parties as to how specifically to proceed if they were unable to successfully negotiate an agreement, including requiring them to file with the Commission the terms agreed upon, the proposed terms not agreed upon, and proposed alternative language.

Rather than comply with the Commission's order, Gauley River, instead, filed a petition for reconsideration requesting that the Commission's previous orders be rescinded and that the Commission enter an order approving either the previously filed Joint Stipulation or the proposed operation and maintenance agreement. The Commission denied the petition and ordered that Gauley River and WVAWC enter into a standard operation and maintenance agreement structured by the Commission.

In this appeal, Gauley River argues that the Commission exceeded its statutory authority in requiring that Gauley River execute the ordered agreement with

16

WVAWC because (1) the agreement was not mutually agreed upon by the parties, and (2) its terms are tantamount to an acquisition of the utility by WVAWC, which is a statutory remedy reserved for failing utilities rather than a distressed utility like Gauley River. The Commission counters that it acted within its statutory authority when it ordered Gauley River and WVAWC to execute the Commission-structured operation and maintenance agreement after the parties failed to negotiate an agreement that substantively complied with the Commission's August 25, 2023, order. The Commission argues that the ordered agreement is not tantamount to an acquisition of Gauley River by WVAWC, but rather, was drafted specifically to avoid an acquisition while allowing WVAWC to correct and stabilize the deficiencies in the Gauley River system, and, for a period of ten years, to operate and maintain it without WVAWC depleting its own resources or placing itself in financial peril. According to the Commission, the terms of the ordered agreement are similar to those included in operation and maintenance agreements between utilities that the Commission has approved in the past.[17] We find no error.

A. *The Commission acted within its statutory authority in ordering Gauley River and WVAWC to enter into the operation and maintenance agreement*

It is well established that the Commission

"was created by the Legislature for the purpose of exercising regulatory authority over public utilities. Its function is to require such entities to perform in a manner designed to

---

[17] *See* W. Va. Code § 24-2-12 (1984) ("Unless the consent and approval of the Public Service Commission of West Virginia is first obtained: (a) No public utility subject to the provisions of this chapter, except railroads other than street railroads, may enter into any contract with any other utility to operate any line or plant of any other utility subject thereto . . . .").

safeguard the interests of the public and the utilities. Its primary purpose is to serve the interests of the public." *Boggs v. Public Service Commission*, 154 W. Va. 146, 174 S.E.2d 331 (1970).

Syl. Pt. 1, in part, *W. Va.-Citizen Action Grp. v. Pub. Serv. Comm'n*, 175 W. Va. 39, 330 S.E.2d 849 (1985). Further,

"[t]he Public Service Commission of West Virginia has no jurisdiction and no power or authority except as conferred on it by statute and necessary implications therefrom, and its power is confined to the regulation of public utilities. It has no inherent power or authority.' Syl. pt. 2, *Wilhite v. Public Service Commission,* 150 W.Va. 747, 149 S.E.2d 273 (1966)."

Syl. Pt. 2, *Casey v. Pub. Serv. Comm'n,* 193 W.Va. 606, 457 S.E.2d 543 (1995).[18]

West Virginia Code § 24-2H-7(b) authorizes the Commission to order a "distressed utility and, if applicable . . . a capable proximate utility, to implement [an] alternative" to acquisition enumerated under the statute. The Commission ordered Gauley River and WVAWC to negotiate a "mutually agreed arms-length" operation and maintenance agreement pursuant to its authority under West Virginia Code § 24-2H-7(b)(2). However, the Commission found (and Gauley River does not dispute) that the parties were unable to successfully negotiate such an agreement. Rather, they sought Commission approval of a consulting-type agreement that left Gauley River in control of the operation and maintenance of its water system—an arrangement counter to the

_____

[18] *See* W. Va. Code § 24-1-1(b) ("The Legislature creates the Public Service Commission to exercise the legislative powers delegated to it. The Public Service Commission is charged with the responsibility for appraising and balancing the interests of current and future utility service customers, the general interests of the state's economy and the interests of the utilities subject to its jurisdiction in its deliberations and decisions.")

18

requirement that WVAWC exercise oversight and managerial control over Gauley River's operation, maintenance, and administrative functions allowing WVAWC "to address and implement remedial actions to correct financial, operational, managerial, and staffing issues" at Gauley River. Gauley River and WVAWC also failed to comply with the requirement that, if an agreement could not be reached, to then identify and file with the Commission those terms that were agreed upon, the proposed terms not agreed upon, and proposed alternative language, among other specific requirements. Given these failures, the Commission proceeded to order Gauley River to implement "[a]ny viable alternative other than an ordered acquisition by a capable proximate utility[,]" as authorized by West Virginia Code § 24-2H-7(b)(6)—the viable alternative to an ordered acquisition being the execution of a Commission-structured standard operation and maintenance agreement. "'A statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syllabus Point 2, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951)." Syl. Pt. 3, *Mason Cnty. Pub. Serv. Dist. v. Pub. Serv. Comm'n of W. Va.*, 247 W. Va. 580, 885 S.E.2d 161 (2022). The Commission thus acted within its authority under the Act in ordering Gauley River and WVAWC to execute this agreement.

B. *The operation and maintenance agreement is not tantamount to an acquisition*

This leads to Gauley River's argument that the Commission also exceeded its statutory authority by requiring the parties to execute an operation and maintenance agreement whose terms, it contends, are tantamount to an acquisition, which is a remedy

19

available to the Commission only upon a finding that Gauley River is a failing utility.[19] In support, Gauley River points to the terms of the ordered agreement providing that (1) WVAWC "agrees to operate, maintain, repair, and/or replace" Gauley River facilities, (2) any replacements or improvements to Gauley River facilities made by WVAWC at WVAWC's expense become capitalized property belonging to WVAWC, (3) Gauley River must grant WVAWC a right to use "rights-of-way, easements, licenses, or other property interests" in instances in which WVAWC installs, replaces, or relocates such capitalized property, (4) Gauley River is required to transfer to WVAWC "all records pertaining to the employment of its employees," and (5) if WVAWC "determines that it is necessary to add a debt service surcharge or modify an existing surcharge, [WVAWC] will prepare a rate modification filing for [Gauley River]." Gauley River contends that these terms are hallmarks of an acquisition and were unlawfully ordered by the Commission in this case. We disagree.

Gauley River's designation as a distressed utility was based upon evidence that the utility's failure to employ a general manager over a long period of time[20] resulted in a prolonged lack of adequate and effective management leading, in turn, to "historic

---

[19] *See* W. Va. Code § 24-2H-7(a), in relevant part ("If the commission determines that the utility is a failing utility, then the commission may order the acquisition of the failing utility by the most suitable capable proximate water or wastewater utility, if there is more than one.").

[20] As previously noted, Gauley River historically relied on its board members to manage its water system despite their lack of experience and specialized skills.

levels of understaffing," and a lack of (1) both strategic, long-term planning and short-term (capital spending) planning, (2) a staffing plan, (3) effective plans for monitoring and enhancing system performance (e.g., water loss production programs, line replacement plans, and capital equipment replacement plans), and (4) emergency or contingency planning. The Commission ordered Gauley River to enter into an operation and maintenance agreement with WVAWC, a capable proximate water utility, as a reasonable and cost-effective measure to remediate these deficiencies, observing that WVAWC's "staffing and expertise . . . place[] it in the best position to provide needed management and oversight of the operations of Gauley River." Further, the Commission determined that the agreement must provide WVAWC with a level of control to "address and implement remedial actions to correct the financial, operational, managerial and staffing issues identified by Staff in this proceeding."

We find that the operation and maintenance agreement the Commission ordered the parties to execute was designed to meet its purpose and does not amount to an acquisition of Gauley River by WVAWC. To the contrary, the ordered agreement preserves Gauley River as a separate legal entity and its duration is for a fixed term of ten years. Under the agreement, capitalized units of property, if made, are to be made at WVAWC's own expense and belong to WVAWC *unless Gauley River purchases such property after termination of the agreement.*[21] To the extent the agreement requires Gauley River to grant

---

[21] The ordered agreement states:

Continued . . .

21

WVAWC the right to use the "rights-of-way, easements, licenses, or other property interests," this requirement does not convey ownership of such assets or property, and WVAWC's right to use Gauley River's rights-of-way, easements, licenses, or other property is limited to that which is "necessary for [WVAWC] to have and own" capitalized units of its own property (again, which property Gauley River may purchase after the agreement terminates). Further, the ordered agreement provides for new line extensions from Gauley River facilities and WVAWC's capitalized property, if approved by the Commission, to be installed by WVAWC but *"[t]he customer(s) applying for the extension, and all customers attaching to such extension, shall be considered [Gauley River] customers and shall be billed at [Gauley River's] rates[.]"* (Emphasis added). Also consistent with WVAWC's operation and maintenance of a distressed utility (and contrary to Gauley River's claim that the ordered agreement is a *de facto* acquisition) are the requirements that WVAWC monitor the quality and quantity of water delivered to Gauley River by its suppliers, read the meters of Gauley River's customers, and directly bill Gauley River customers on behalf of Gauley River; however, *"[a]ll of the customers currently*

> In the event [WVAWC], under the terms of this Agreement, is required to install, relocate, or replace any property associated with or attached to [Gauley River] Facilities, which, under the accounting system used by [WVAWC] and approved by the Commission is a capitalized unit of property ("Capitalized Property"), [WVAWC] shall make such installation, relocation or replacement at its own cost; *Provided*, that Capitalized Property shall then be, and remain the property of [WVAWC] (unless purchased by [Gauley River] from [WVAWC] after termination of this Agreement as provided in Section VI [sic] hereof)[.]

22

*served by [Gauley River] Facilities under this Agreement shall remain [Gauley River]*

*customers."* (Emphasis added). The ordered agreement also gives Gauley River "the right

to have its accountant(s) review, at least annually, the system of accounts maintained by

[WVAWC] for [Gauley River]." Suffice it to say, the terms of the ordered agreement do

not amount to an acquisition of Gauley River by WVAWC, but rather, lawfully provide for

WVAWC to operate and maintain Gauley River, a distressed utility, for a period of years

in an effort to remediate identified financial, operational, managerial, and staffing issues

that the Commission found to have plagued Gauley River for many years.[22]

---

[22] To the extent Gauley River argues that the Commission failed to recommend the ordered agreement to the Fayette County Commission, as the utility claims the Commission was required to do, we find this argument to be without merit. West Virginia Code § 24-2H-8(f) provides, in relevant part: "If the distressed or failing utility is a public service district, then the commission shall make a recommendation to the respective county commission(s) *with regard to the acquisition of distressed or failing utilities* as provided in § 16-13A-2(a)(2) of this code." (Emphasis added). Because we have determined that the ordered agreement is not an acquisition of Gauley River by WVAWC, the requirements of West Virginia Code § 24-2H-8(f) do not apply.

Finally, Gauley River superficially argues that (1) the ordered agreement fails to advance the public policy goals of the Act, (2) there is no evidence in the record showing that Gauley River is not fulfilling these public policy goals, (3) "Gauley River's proposed projects and CAP were a better path to fulfilling [those] goals," and (4) the ordered agreement will "increase rates to Gauley River's customers above those which Gauley River would charge if it were simply permitted to implement the CAP and advance its proposed projects." We dismiss these arguments out of hand. Gauley River's casual mention of these issues, without citation to the record or other pertinent authority, is insufficient to invoke our appellate review. "Typically, this Court will not address issues that have not been properly briefed." *State v. White*, 228 W. Va. 530, 541 n.9, 722 S.E.2d 566, 577 n.9 (2011). *See also State v. LaRock,* 196 W.Va. 294, 302, 470 S.E.2d 613, 621 (1996) ("Although we liberally construe briefs in determining issues presented for review, issues which are . . . mentioned only in passing but are not supported with pertinent authority[] are not considered on appeal.").

23

## IV.    Conclusion

For the reasons stated above, the October 31, 2024, order of the Public Service Commission of West Virginia is hereby affirmed.

Affirmed.